UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

| | | |
|---|---|---|
| In re | ) | |
| | ) | |
| LINDA J. NOFZIGER, | ) | Case No.  6:04-bk-09253-KSJ |
| | ) | Chapter 7 |
| Debtor. | ) | |
| ──────────────────────── | ) | |
| | ) | |
| MITCHEL KALMANSON, | ) | |
| | ) | |
| Plaintiff, | ) | Adversary Proceeding 6:06-ap-35 |
| v. | ) | |
| | ) | |
| LINDA J. NOFZIGER, | ) | |
| | ) | |
| Defendant. | ) | |
| ──────────────────────── | ) | |

<u>MEMORANDUM OPINION</u>

The debtor, Linda Nofziger, and Mitchel Kalmanson, a potential creditor, have lodged a multiplicity of claims against each other.  The gravamen of the parties' disputes arose from the assistance the debtor gave to Kalmanson's former wife in their aggressively litigated divorce that was filed in 1999 and is still on-going.  Kalmanson asserts that the debtor acted improperly; the debtor denies these allegations and asserts various counter-claims against Kalmanson, mostly arising from his alleged disclosure of confidential information.  Because all of these issues are intertwined, the parties presented evidence for five days on all pending matters.  This memorandum opinion will rule on all these pending matters as well as on various post-trial motions filed by the parties.[1]

---

[1] **Pending matters in Main Case**:  Debtor's Objection to Claim No. 5 Filed by Mitchel Kalmanson (Doc. No. 77); Kalmanson's Response to Debtor's Objection to Claim No. 5 (Doc. No. 98); Debtor's Request for Ruling as to Sanctions and/or Damages Pursuant to Court's Order Granting Motion for Contempt (Doc. No. 300); Debtor's Second Motion for Contempt against Creditor Mitchel Kalmanson (Doc. No. 310); Debtor's Motion for Contempt and Sanctions against Kalmanson, McFarlin, Roy, Ackert (Doc. No. 574); Debtor's Motion for Contempt and Sanctions against Kalmanson, McFarlin, Roy (Doc. No. 575); Debtor's Amended Motion for Contempt and Sanctions against Kalmanson, McFarlin, Roy (Doc. No. 689); Kalmanson's Motion for Sanctions (Doc. No. 755); Kalmanson's Motion Seeking Relief from Seal Order (Doc. No. 587); Motion by Roy, Ackert, and McFarlin Seeking Relief from Seal Order (Doc. No. 683); Debtor's Response to Kalmanson's Motion for Relief from Seal and Discovery Orders (Doc. No. 686); Kalmanson's Motion for Relief from Seal and Discovery Orders (Doc. No. 681); Court's Order to Show Cause (Doc. No. 671); Kalmanson's Motion to Exclude Evidence of Alleged Abuse (Doc. No. 745); Kalmanson's Motion to Strike Debtor's Answer and to Strike Debtor's Motions for Contempt (Doc. No. 746); Debtor's Motion to (1) Stay State Court Proceedings, (2) for an

<u>Debtor's Background</u>.  The debtor, in her mid-50's, has a limited education, taking a smattering of college courses but receiving no degree.  She adopted one daughter with her second husband, Ruben Rendon, and had another daughter with her third husband, Arlynn Nofziger.  She has been married four times, each time taking her husband's last name.[2]  At the time she filed this bankruptcy case, initially as a Chapter 13 proceeding,[3] on August 12, 2004, she was known as Linda Nofziger.

<u>Marriage to and Divorce from Ruben Rendon</u>.  The debtor and Ruben Rendon were married on August 25, 1979.  They lived in Texas during most of their married life.  The debtor contended that Rendon physically and mentally abused her during the latter years of their marriage and points to two specific incidents of abuse—one occurring in Texas on August 3, 1992, and one occurring in Indiana[4] on March 24, 1993.

On August 3, 1992, police officers responded to a family disturbance call at the Rendon home in Texas.  (Debtor's Ex. No. 77).  Rendon was intoxicated and had locked the debtor out of the house.  She complained Rendon yelled, struck her, threw her across the room, then tossed her from the house, locking the door preventing her re-entry.  The police officers convinced Rendon to leave the home and took him to jail for a short time.  The police officers noted that the debtor had bruises

---

Order to Show Cause, (3) to Compel Roy to Immediately Appear and Testify, (4) to Compel Compliance with Orders of this Court, (5) to Refer the Violations of this Court's Orders by Roy to the Florida Bar (Doc. No. 757); Debtor's Amended Motion to (1) Stay State Court Proceedings, (2) for an Order to Show Cause, (3) to Compel Roy to Immediately Appear and Testify, (4) to Compel Compliance with Orders of this Court, (5) to Refer the Violations of this Court's Orders by Roy to the Florida Bar (Doc. No. 770); Roy's Motion to Strike Debtor's Emergency Motion (Doc. No. 773); Kalmanson's Motion to Strike Nofziger Rebuttal Argument (Doc. No. 779); **Pending matters in Adversary Proceeding**: Amended Complaint – Count 2 (Doc. No. 24); Roy's (1) Motion by Non-Party to Seal, (2) Notice of Filing Supplemental Authority, (3) Notice of Filing Second Supplemental Authority (Doc. No. 112); Roy's Verified Motion for Summary Judgment (Doc. No. 117); and Kalmanson's Motion to Amend Amended Complaint to Conform to Evidence (Doc. No. 138).

[2] The debtor had a youthful marriage to Gary Frank (1974-1977), and was married to Ruben Rendon from 1979 through February 29, 1996.  She married Arlynn Nofziger on September 16, 1996, and she received a final order of divorce from him on November 8, 2004, after this bankruptcy case was filed.  She later married Jack Marlow and currently is known as Linda J. Marlow.

[3] The debtor converted her Chapter 13 wage earner/reorganization case to a Chapter 7 liquidation case on January 10, 2006. (Doc. No. 220).

[4] The Rendons, who were suffering financial difficulties, moved to Indiana shortly after filing bankruptcy in Texas on February 18, 1993. (Kalmanson Ex. No. 25).  The debtor's parents lived in Indiana, owned two restaurants, and offered jobs to both the debtor and Mr. Rendon.

on her face from the incident.  The debtor withdrew all criminal charges and continued to live with Rendon after this incident.

The second alleged domestic violence incident occurred in Indiana on March 24, 1993.  The debtor reported that Rendon refused to allow her or their daughter to leave their home for several hours.  (Kalmanson Ex. No. 18).  Eventually, the debtor's father, with the assistance of the local police force, convinced Rendon to leave the home.  No credible evidence indicates that the debtor sought any medical treatment as a result of the domestic abuse by Rendon.

On July 20, 1993, the debtor retracted her statement made in connection with the criminal proceeding filed against Rendon in Indiana.  (Kalmanson Ex. No. 68).  She already had returned home to live with Rendon immediately after the domestic abuse incident and now stated that she was "coerced or pressured into making a statement more harsh that [sic] it otherwise would have been." She further stated, "any prosecution…will only serve to strain the marital relationship."  The charges later were dropped.

Rendon, during his deposition, gave incomplete, evasive, and inconclusive answers as to whether the abuse actually occurred, either in Texas or in Indiana.  Weighing the debtor's testimony, Rendon's deposition testimony, and the exhibits attached to Rendon's deposition, which, to some extent, support the debtor's allegations, the Court finds that the debtor was subject to some degree of domestic abuse during her marriage to Rendon.  Although the debtor testified about horrific incidents of abuse, such as a broken leg, she was unable to support her allegations with any credible documentary evidence.  Moreover, after each incident of domestic abuse, the debtor returned to the marital home and resumed living with Rendon.  In the end, Rendon left the debtor to return to Texas in the fall of 1993, not vice versa.

Domestic abuse often occurs in private family settings and, as here, an alleged abuser may deny his involvement.  Therefore, the Court finds that, although the debtor has demonstrated some factual basis for the abuse that occurred during her marriage to Rendon, she has failed to

demonstrate the abuse was as severe as she has claimed or reasonably constitutes any continuing threat to her or her children after Rendon left Indiana in 1993.

In January 1994, the debtor filed a petition to dissolve her marriage to Rendon.  The debtor last saw Rendon in December 1995.  She may have had one final telephone call with Rendon as late as June 1996.  A final decree of divorce issued on February 29, 1996. (Kalmanson Ex. No. 15).  The debtor has had no contact with Rendon, other than the recent deposition, for twelve years.

Nor did the state court handling the Rendon divorce prevent Rendon's visitation with his adopted daughter.  When the debtor did not permit the ordered visitation, the Indiana state court, rejecting the debtor's fears of further abuse, established a visitation schedule. (Kalmanson Ex. No. 13).  When the debtor did not comply with the visitation order, on May 1, 1997, the Indiana state court held her in contempt and issued a judgment against her and in favor of Rendon for $3,587.47 (Kalmanson Ex. No. 9).[5]

Marriage to Arlynn Nofziger and Move to North Carolina.  Prior to her divorce from Rendon, the debtor started a romantic relationship with Arlynn Nofziger.  They married on September 16, 1996, several months after their daughter was born.  The debtor, her new husband, and her two daughters moved to North Carolina in the fall of 1996.  The debtor, who was facing contempt charges in the Indiana state court for her refusal to allow visitation between Rendon and his daughter, told her current husband, who had neither met nor spoken with Rendon, that she was afraid of her former husband.  The family used a post office box, rather than a street address, for all mail allegedly to prevent Rendon from locating them.

Termination of Rendon's Parental Rights.   Once settled in North Carolina, the debtor filed an action to terminate Rendon's parental rights.  A consent possibly signed by Rendon was filed in this action.  (Kalmanson Ex. No. 26).  The consent stated that Rendon agreed to voluntarily terminate his parental rights.  Kalmanson now contends this signature was forged, which is

---

[5] The debtor has not paid this obligation and has not listed this debt in the schedules she filed in this bankruptcy case. She testified that the debt was forgiven at the time Rendon terminated his parental rights.

supported by the testimony and report of his handwriting expert, Dawn Roberts. (Kalmanson Ex. No. 65).

Whether Rendon actually signed this consent is not germane to the issues in this bankruptcy case, and the Court makes no finding on this issue, other than to conclude that Rendon made no attempt to contact either the debtor or his adopted daughter after his parental rights were terminated on November 19, 1998.[6] (Kalmanson Ex. No. 26).  Nor has Rendon ever objected to Arlynn Nofziger also adopting the same daughter Rendon himself previously had adopted.[7]  Rendon has made absolutely no effort to collect any monies due to him, to locate the debtor, or to threaten her for well over ten years, if not longer, and, based on his recent deposition testimony, would prefer to stay as far away from her as possible. (Debtor Ex. No. 64).

Therefore, although the debtor likely was a victim of domestic abuse during her marriage to Rendon, any potential for future abuse ended when Rendon returned to Texas in 1993.  All of the debtor's allegations of domestic abuse occurred during the time she lived with Rendon.  None occurred after he left her in 1993.  No incident occurred between the day he left Indiana and the day of their divorce in February 1996, even though he knew where the debtor and their daughter lived the entire time.  The debtor may subjectively fear Rendon, but no objective proof demonstrates that Rendon is a continuing threat or even interested in the debtor or her family at this point.  Rendon poses no present danger to the debtor or her family.

<u>Change in Social Security Number</u>.  Yet, the debtor relied on her alleged but unsupported fear of Rendon as a basis to change both her and Arlynn's social security numbers in July 1999. Both she and Arlynn Nofziger filed applications with a program sponsored by the Social Security Administration designed to assist victims of domestic abuse to change their social security numbers alleging that the debtor was being harassed or abused and that her life was in danger. (Kalmanson

---

[6] The Order for Termination of Parental Rights was dated January 25, 1999, but was effective *nunc pro tunc* to November 19, 1998.

[7] Arlynn Nofziger adopted the debtor's oldest daughter in 1999. (Kalmanson Ex. No. 56).

Ex. Nos. 45 and 46). The applications contained a number of misstatements and, according to Arlynn Nofziger, were submitted in an effort to improve the debtor's negative credit rating caused by her poor payment history and 1993 bankruptcy filing.

Although both the debtor and Arlynn did succeed in changing their social security numbers, the debtor never changed her identity or effectively disassociated herself from her past credit problems. Credit bureaus still reported the debtor's old and new social security numbers, as represented by the Chapter 13 trustee originally appointed in this case at a hearing held on September 20, 2004. The change in social security numbers certainly did nothing to protect the debtor from her former husband. At best, the new numbers possibly gave the debtor the ability to start a new financial history, nothing more.

The debtor has never obtained a new identity or changed her name, other than upon a new marriage. The debtor was never in a witness protection program. She simply asked for and received a new social security number.

Move to Florida. The debtor and Arlynn moved to Florida in late 1999 or early 2000. In March 2000, the debtor filed a fictitious name registration for a group titled: "Victims Rights and Protective Services." (Kalmanson Ex. No. 38). Although the debtor never legally incorporated the business and has no formal training, she apparently helped between 30 to 40 women going through divorces, some of them escaping domestic violence. In her own divorce, the debtor described her work as a "Ministry helping abused women, men, and children associated with domestic violence" and that she helped her clients find "shelters, food, clothes, employment, childcare, attorneys," etc. (Kalmanson Ex. No. 44, question 2(b)). The debtor testified that her experience as a victim of domestic abuse enabled her to help other women in similar circumstances. The debtor acknowledges that she drafted pleadings, motions, and witness subpoenas for these women. She also conducted factual investigations and assisted them in obtaining attorneys, if they could afford one.

In all likelihood, the debtor's offer of assistance to these women exceeded the normal bounds of propriety. For example, one of her clients was Jodi Ogden. Ms. Ogden testified that the debtor encouraged her to assert claims that her estranged husband sexually abused their children in her divorce petition in order to bolster her likelihood of the court denying visitation to the father. Ms. Ogden, who was offended at this suggestion because no such sexual misconduct occurred, rejected this idea and required the debtor to remove this allegation from the draft divorce petition. It is this type of over-zealous assistance to Donna Robinson, Mitchel Kalmanson's former wife, that has caused so many of the issues asserted in this bankruptcy case.

Kalmanson Divorce. Mitchel Kalmanson, who specializes in insuring and transporting exotic animals, married Donna Robinson ("Donna") in 1991. The marriage lasted eight years, and in 1999, Donna filed a divorce petition. The case now has been on-going for longer than the marriage.

Both Donna and Mitchel, irrespective of any action or involvement of the debtor, have used extremely aggressive litigation tactics against each other as the parties demanded multiple judicial recusals, and the courts transferred the divorce case from one county to another county in the Florida state court system.[8] Kalmanson has hired at least 13 different and successive attorneys, including his current lawyer, William Glen Roy. At the time of the trial in this bankruptcy case, at least 27 separate motions were pending in the Kalmanson divorce action.

Kalmanson's claims against the debtor all arise from the debtor's assistance to Donna in this acrimonious divorce case. The debtor did not even meet Donna until 2002, so the divorce case had been on-going for almost three years when the debtor first got involved. The Final Judgment of Dissolution was entered prior to the debtor's involvement.

Without question, the debtor acted as a zealous advocate for Donna. As the state court found, the debtor's involvement was "destructive to the family. It undermined the Mother's

---

[8] The Florida state courts have assigned multiple judges to the Kalmanson divorce action. When no judge in Lake County would agree to accept the case, the action was transferred to Citrus and Marion Counties for some period of time. (Debtor Ex. No. 99, p. 43).

credibility, generated animosity, and increased litigation expenses for both parents." (Kalmanson Ex. No. 33, p.16).  Eventually, the state court ordered the debtor to have no further contact with the Kalmanson children.  (Kalmanson Ex. No. 33, p. 29).  However, the fact is that the debtor merely acted to advise and assist Donna.  Donna, not the debtor, ultimately decided how she wanted to handle her own divorce and post-dissolution matters, as the Florida state court recognized in its order.  Responsibility rightfully falls on Donna for her actions in the divorce, not automatically on the debtor.

Kalmanson makes a number of representations that the debtor, not Donna, is directly responsible for actions she took in assisting Donna in the Kalmanson divorce.  For example, Kalmanson argues that the debtor conducted investigations of witnesses, judges, attorneys, and on the facts related to the Kalmanson divorce and that the debtor engaged in various criminal actions such as illegally obtaining private insurance/medical records of third parties, engaging in the unauthorized practice of law by helping Donna draft legal pleadings, and wrongfully recorded phone conversations between Kalmanson and his children.

Of all of these allegations, only one is directly relevant to the issues raised in this bankruptcy case—Kalmanson has pled one count of defamation in Adversary Proceeding Number 6-35 asserting that the debt, if any, due to Kalmanson by the debtor is not dischargeable. Kalmanson asserts that the debtor made a defamatory statement against him when she filed an amended narrative statement with the Lake County Police Department.  The circumstances surrounding this statement and whether it was defamatory will be discussed later in this Opinion.

Nofziger Divorce.      In January 2004, the debtor filed a petition to divorce Arlynn Nofziger. (Kalmanson Ex. No. 5).  Shortly after filing this bankruptcy case and about the same time she was seeking to seal her bankruptcy file, the debtor sought, on September 20, 2004, to seal her own divorce file and to obtain a restraining order against Mitchel Kalmanson. (Kalmanson Ex. No. 22). She stated that she was in a federal witness protection program to justify sealing the divorce file

from public viewing.  She also made a vague reference to an injunction entered by this Court, when, at that time, no seal order had been entered.

The final judgment dissolving the debtor's marriage to Arlynn was entered on November 8, 2004. (Kalmanson Ex. No. 3).  Arlynn was given liberal visitation rights with his two daughters, but, until recently, he never made any significant efforts to see the girls, although on July 8, 2004, he did file, but did not pursue, a motion in his divorce case asking the Court to establish a visitation schedule.  (Kalmanson Ex. No. 12).  With the encouragement of Kalmanson's current state court attorney, William Glenn Roy, Arlynn has filed pleadings in his divorce action seeking to restore contact with the children.  During and shortly after the trial in this bankruptcy case, Arlynn, with Roy's representation, was actively pursuing his visitation rights against the debtor.  Due to the apparent animosity held by Arlynn to the debtor and his attempt in this bankruptcy case to gain an advantage in his visitation dispute pending in state court, the Court found that Arlynn's testimony was largely self-serving and lacking in credibility.  His recollection and memory seem greatly affected by the issues raised in his current litigation against the debtor.  In any event, the Court intends to allow the Florida state court to resolve the visitation issues pending before it and limit any rulings in this bankruptcy case that would affect the state court's decision.

Kalmanson's State Court Action against the Debtor and Nancy Adams.  In 2003, Kalmanson sued the debtor and Nancy Adams for various state law claims, including defamation in Seminole County, Florida, Case Number 03-CA-2679-16-L (the "State Civil Action").    Additionally, Kalmanson's first amended complaint alleged that Adams and the debtor engaged in civil conspiracy, made false reports of attempted child kidnapping and of animal abuse, obtained private insurance and medical records without lawful authority, and intimidated and/or harassed witnesses. The action was stayed by the filing of this bankruptcy case on August 12, 2004.  (Kalmanson Ex. No. 32).

Nancy Adams is an acquaintance of Mitchel, Donna, the debtor, and Arlynn Nofziger. She relishes behind-the-scene intrigue and likely has caused many of the problems and misperceptions complained of by the parties. The Court finds her testimony un-trustworthy.

Chapter 13 Bankruptcy and Protective Orders. The debtor originally filed this case as a Chapter 13 bankruptcy. On September 16, 2004, the Chapter 13 trustee conducted and concluded a meeting of creditors pursuant to Section 341 of the Bankruptcy Code.[9] During this meeting of creditors, Kalmanson's former attorney, James Monroe, asked the debtor questions about duplicate social security numbers, her prior business, known as R.L. Rendon, Incorporated, and her former name, Linda J. Rendon.

Three days later, on September 19, 2004, the debtor filed a motion to seal the transcript of the meeting of creditors and to prevent anyone, including Kalmanson, from inquiring into her identity prior to 1999. (Doc. No. 14 in Main Case). She represented that she was "a federally protected witness," had received a new identity, and would be placed in danger if her true identity was disclosed.

The Court held a hearing on the debtor's motion the next day, September 20, 2004. The debtor, debtor's counsel, and the Chapter 13 trustee[10] attended the hearing; however, counsel for Kalmanson was excluded, due to the debtor's expressed safety concerns. During the hearing, the debtor again represented that she was in "the federal witness protection program" and that Kalmanson had learned of her prior identity improperly. The debtor also referenced the March 1993 domestic violence incident in Indiana, calling it a "hostage" situation.

Debtor's counsel later submitted an order consistent with the debtor's statements made during this hearing. The Court signed the order on October 8, 2004. (Doc. No. 31 in Main Case) (the "Seal Order"). The Seal Order directed parties, including Kalmanson, to refrain from "exposing any

---

[9] Unless otherwise stated, all references to the Bankruptcy Code refer to Title 11 of the United States Code.
[10] The attorney for the Chapter 13 trustee represented at this hearing that he was able to locate the debtor's prior social security number and identity simply by running a credit report on her, which their office routinely does when a Chapter 13 case is filed. (Kalmanson Ex. No. 69, pgs. 8-9).

information divulged" at the debtor's meeting of creditors and provided that the debtor need not "answer any question or inquiry, nor provide any information of any kind concerning herself…prior to 1999."

The Court later issued two orders consistent with the Seal Order—a Protective Order (Doc. No. 113 in Main Case) entered on June 15, 2005,[11] and an order entered on March 8, 2007, establishing discovery guidelines (Doc. No. 487 in Main Case).[12]  The Court will refer to all three of these orders (Doc. Nos. 31, 113, and 487 in Main Case) as the Protective Orders in this Opinion.

The Protective Orders were each designed to prevent certain sensitive information revealed at the debtor's Section 341 meeting from disclosure. The debtor consistently argued that, if Rendon discovered where she lived, he would harm her and her family.  Believing the debtor's fear was reasonable, the Court consistently enforced the terms of the Protective Orders in this case.  Now, however, Kalmanson argues that the Protective Orders were improvidently issued because the debtor has no reasonable basis for her fears that would justify the extraordinary amount of confidentiality imposed by the Protective Orders.

Rescission of Protective Orders.  Kalmanson and his attorneys seek relief from the Protective Orders asserting the orders were premised on multiple false representations made by the debtor and her then-counsel, Arlys Buschner, and constitute fraud on the Court.[13]  Alternatively, the movants seek relief because the orders are no longer needed or equitable. Specifically, the movants argue that the debtor misrepresented that she was in a federal witness protection program, when she had only

---

[11] This order provided that any documents obtained by the parties in discovery were to remain confidential, to be used only in this litigation, and could not be shared with third parties other than attorneys and experts hired by the parties or the Chapter 13 trustee.

[12] After numerous discovery disputes between the parties, the Court entered this order to establish discovery guidelines and specifically provided that the debtor need not disclose her current residence.  In general, Kalmanson was allowed to take discovery of any third party and to inquire into the debtor's life prior to 1999, particularly about the domestic abuse involving Rendon, provided that the discovery was kept confidential and no deposition of Ruben Rendon occurred without further court approval.  The Court later approved Kalmanson's request to depose Rendon.  (Doc. No. 642).

[13] Kalmanson and his attorneys, David McFarlin, William Glenn Roy, Jr., and T.W. Ackert, filed similar motions seeking relief from the seal order.  (Doc. Nos. 587 and 683 in Main Case).

obtained a new social security number, and that she exaggerated the nature of the domestic abuse she endured during her marriage to Rendon.

Federal Rule of Civil Procedure 60, made applicable in bankruptcy cases by Bankruptcy Rule 9024, liberally provides that a court can relieve a party or the party's legal representative from an order or final judgment for any reason justifying relief (Fed. R. Civ. P. 60(b)(6)), including fraud, misrepresentation, or misconduct by an opposing party (Fed. R. Civ. P. 60(b)(3)), or in circumstances where the judgment or order is no longer equitable (Fed. R. Civ. P. 60(b)(5)). No time limit is imposed for bringing this type of motion seeking relief under Rule 60(b) 3, 5, or 6. "Fraud that prevents the functioning of the judicial process does not have to be brought within any specific period of time." S.E.C. v. ESM Group, Inc., 835 F.2d 270, 273-274 (11th Cir.1988) (citing, e.g., Hazel-Atlas Glass Co. v. Hartford-Empire Co., 322 U.S. 238 (1944); DeClaire v. Yohanan, 453 So.2d 375 (Fla.1984)).

The Eleventh Circuit Court of Appeals defines "fraud on the court" as "embrac[ing] only that species of fraud which does or attempts to, defile the court itself, or is a fraud perpetrated by officers of the court so that the judicial machinery cannot perform in the usual manner its impartial task of adjudging cases that are presented for adjudication, and relief should be denied in the absence of such conduct." Traveler's Indemnity Co. v. Gore, 761 F.2d 1549, 1551 (11th Cir. 1985) (perjury by defendant did not constitute fraud on the court). "Generally speaking, only the most egregious misconduct, such as bribery of a judge or members of a jury, or the fabrication of evidence by a party in which an attorney is implicated, will constitute a fraud on the court." Rozier v. Ford Motor Co., 573 F.2d 1332, 1338 (5th Cir. 1978)[14] ("to set aside a judgment or order because of fraud upon the court under Rule 60(b)…it is necessary to show an unconscionable plan or scheme which is designed to improperly influence the court in its decision.")(citations omitted); Gelinas v.

---

[14] Pursuant to Bonner v. City of Pritchard, 661 F.2d 1206, 1209 (11th Cir. 1981)(en banc), decisions from the former Fifth Circuit Court of Appeals prior to October 1, 1981, are binding precedent in the Eleventh Circuit.

Accelerated Benefits Corp., 2005 WL 2656575, 1 (M.D. Fla. 2005)(fraud on the court is to be "construed narrowly").

The movants' primary argument in support of rescinding the Protective Orders is that the debtor misrepresented she was in a federal witness protection program when, in fact, she merely had changed her social security number under a program designed to protect victims of domestic violence. Although the debtor and her attorney initially *did* represent that the debtor was a federally protected witness with a new identity at the time the Seal Order was entered in October 2004, the debtor quickly clarified the error.   On January 6, 2005, during a court hearing, the debtor acknowledged her participation in the program sponsored by the Social Security Administration and not a federal witness protection program.  (Debtor Ex. 99, p. 18).   Moreover, as the United States District Court for the Middle District of Florida noted, in affirming the validity of the entry of the Seal Order, the mistake in calling the program a witness protection program or a program to assist victims of domestic abuse is immaterial:

> Kalmanson also points to the fact that the Debtor (and others) have referred to the program that provided her with a new identity as a "witness protection program," when it was apparently a program to protect victims of domestic violence rather than witnesses per se.  But such a misdescription would not be evidence of a lack of honesty.   Even if the program is not properly referred to as a "witness protection program," the Court sees no illicit advantage the Debtor could have gained by describing it as a program to protect witnesses rather than a program to protect victims of domestic violence.  As such, there is no reason to suspect that the Debtor lied by describing it that way.

(Doc. No. 300, Ex. A, in Main Case).  The Court similarly finds no fraud committed by the debtor in initially seeking the Seal Order.  The debtor admittedly portrayed the governmental program she used as a "witness protection program" when, in fact, the program was designed to assist victims of domestic abuse.  However, the debtor quickly corrected the error and no material harm resulted from the misrepresentation.  The debtor did not engage in any type of "unconscionable plan or scheme …designed to improperly influence the court in its decision."  As such, the Protective Orders will not be set aside due to fraud on the Court.

Alternatively, the movants argue the orders are no longer needed or equitable because the debtor grossly exaggerated the nature of the domestic abuse.   They assert that, upon balancing the public policy of keeping court records public against the unlikely possibility of future harm to the debtor or her family by Rendon, the files in this bankruptcy case should be completely opened to the public.[15]  On this point, the Court agrees.

Keeping court records open to the public is an important public policy.  "The federal courts have long recognized the strong common law presumption in favor of public access to court proceedings and records." In re General Homes Corp., 181 B.R. 898, 903 (Bankr.S.D.Tex.1995) (citing In re Analytical Systems, Inc., 83 B.R. 833 (Bankr.N.D.Ga.1987); Nixon v. Warner Communications, Inc., 435 U.S. 589, 597 (1978); Wilson v. American Motors Corp., 759 F.2d 1568, 1570 (11th Cir.1985)); Romero v. Drummond Co., Inc., 480 F.3d 1234, 1245 (11th Cir. 2007) (observing that the common law right of access, including the right to inspect and copy public documents, is essential to the integrity of the judicial process, citing the United States Supreme Court decision in Landmark Commc'ns, Inc. v. Virginia, 435 U.S. 829, 839 (1978) and an earlier decision of the Eleventh Circuit, Chicago Tribune v. Bridgestone/Firestone, 263 F.3d 1304, 1311 (11th Cir. 2001)).

The presumption in favor of public access is "codified in Section 107(a) of the Bankruptcy Code, which provides that a paper filed in a bankruptcy case and the dockets of a bankruptcy court are public records and are open to examination." General Homes, 181 B.R. at 903.  Of course, a

---

[15] The movants also assert that the debtor has waived any entitlement to confidentiality because the debtor herself has disclosed protected information relating to her prior identity.  On February 25, 2000, the debtor listed her name and residential address when she filed an application for a fictitious name with the Florida Secretary of State. (Kalmanson Ex. No. 38).  This disclosure occurred prior to the entry of the Protective Orders and cannot constitute a knowing waiver.  Shortly after the entry of the Seal Order, however, on December 14, 2004, the debtor obtained a licensed to marry her current husband and listed her maiden name, known to Rendon.  (Kalmanson Ex. No. 10).  The debtor claims she did not know the marriage license was a public document and, in any event, did not list her identity as Linda Rendon.  The Court finds this disclosure also was not a knowing waiver.  Lastly, on August 24, 2007, the debtor mistakenly filed a pleading containing protected information about her marriage to Rendon in the public records in this case instead of first asking that the record be sealed; this innocent mistake was quickly corrected when the pleading was sealed a few days later.  The debtor never intentionally revealed any protected information after the Seal Order was entered, and no waiver occurred.

party can overcome the presumption of public access by demonstrating a valid reason to seal a file. "The common law right of access may be overcome by a showing of good cause, which requires 'balanc[ing] the asserted right of access against the other party's interest in keeping the information confidential.'" <u>Romero</u>, 480 F.3d at 1245 (<u>citing</u> <u>Chicago Tribune</u>, 263 F.3d at 1309). '[W]hether good cause exists ... is ... decided by the nature and character of the information in question.' <u>Romero</u>, 480 F.3d at 1245 (<u>citing</u> <u>Chicago Tribune</u>, 263 F.3d at 1315). "In balancing the public interest in accessing court documents against a party's interest in keeping the information confidential, courts consider, among other factors, whether allowing access would impair court functions or harm legitimate privacy interests, the degree of and likelihood of injury if made public, the reliability of the information, whether there will be an opportunity to respond to the information, whether the information concerns public officials or public concerns, and the availability of a less onerous alternative to sealing the documents." <u>Romero</u>, 480 F.3d at 1245 (<u>citing</u> <u>In re Alexander Grant & Co. Litig.</u>, 820 F.2d 352, 356 (11th Cir.1987); <u>Shingara v. Skiles</u>, 420 F.3d 301, 305-06 (3d Cir. 2005); <u>Amodeo</u>, 71 F.3d 1044, 1050-51 (2nd Cir. 1995)).   The factors articulated by the Eleventh Circuit and the circumstances in this case weigh heavily in favor of vacating the Protective Orders and allowing public access to the pleadings filed in this case.

At the time the Protective Orders were entered, the debtor described her marriage to Rendon in graphically violent terms and stated that Rendon held her and their daughter hostage until she was rescued by a police force SWAT team.   After taking evidence on these allegations, however, it appears the debtor overstated the nature of the domestic violence, as discussed above.   The Court finds that, although some violence may have occurred during the debtor's marriage to Rendon, she has had no contact with Rendon for almost twelve years.   He has made no attempt to locate or threaten her or her family since he left the marriage in 1993, even though he knew where they lived. He is not a continuing or present danger to her and her family.   The debtor, sadly, is running from someone who is no longer chasing her.

As such, there is no longer any reason to keep the files in this case or the information relating to the debtor's former name or circumstances confidential.  Thus, there is no longer any need for the Protective Orders.  The movants' motions for relief from the Protective Orders (Doc. Nos. 587 and 683 in Main Case) are granted. The Protective Orders (Doc. Nos. 31, 113, and 487 in Main Case) are vacated together with every other order entered in this case which required the clerk to seal any pleading.  Upon this Opinion and the Related Orders becoming final, the clerk is directed to restore every formerly sealed document to allow public access to these pleadings.

Contempt Motions.    After the entry of the Seal Order, the litigation between the debtor and Kalmanson escalated substantially due to the debtor's repeated claims that Kalmanson or his attorneys violated the terms of the Protective Orders. The debtor filed at least five (and perhaps more) motions seeking sanctions or to hold Kalmanson or his attorneys in contempt of court alleging breaches of the Seal Order. (Doc. Nos. 300, 310, 574, 575, and 689 in Main Case).

In the first contempt motion (Doc. No. 186 in Main Case), the debtor alleged that Kalmanson, who at the time was representing himself, had disclosed confidential information relating to the debtor's divorce to Rendon.  Kalmanson, dissatisfied with the entry of the Seal Order, initially sought reconsideration with this Court (Doc. No. 120 in Main Case), and, when that request was denied, filed a timely appeal. In his pro se appellate brief, Kalmanson included a copy of a published decision of the Indiana Court of Appeals in the Rendon divorce action, Rendon v. Rendon, 692 N.E.2d 889 (Ind. App. 1998), discussed above, in which the debtor was found in contempt of court for failing to permit court ordered child visitation.  Because Kalmanson intentionally and publicly connected the debtor's current bankruptcy case with her prior protected identity as Linda Rendon and for the reasons explained in more detail in the written opinion (Doc. Nos. 272 and 273 in Main Case), this Court found that Kalmanson had violated the confidentiality provisions of the Seal Order and should be held in contempt.[16]  However, the Court reserved ruling on any damages or

---

[16] The United States District Court for the Middle District of Florida agreed and affirmed the decision in its written opinion. (Doc. No. 300 in Main Case).

sanctions.  The debtor later filed a motion seeking sanctions against Kalmanson for this violation. (Doc. No. 300).

The debtor filed her second motion for contempt against Kalmanson (Doc. No. 310 in Main Case) when he filed the same published decision of the Indiana Court of Appeals in the Kalmanson divorce action.  Apparently, Kalmanson wanted to demonstrate some sort of bad faith or improper action by the debtor to the judge in his own divorce case.  The debtor contended that this republication also violated the Seal Order.  For similar reasons articulated in connection with granting the debtor's first motion for contempt, the Court, likewise, granted this motion, again finding Kalmanson in contempt but reserving any ruling as to damages. (Doc. No. 354 in Main Case).

Next, the debtor filed two motions for contempt against both Kalmanson and his attorneys. (Doc. Nos. 574 and 575, as later amended in Doc. No. 689, in Main Case).[17]  The thrust of the debtor's argument is that Kalmanson and his state court attorneys intentionally violated the Protective Orders by inquiring into the debtor's identity and circumstances prior to 1999, as well as by seeking information regarding the debtor's current residence.  The debtor also alleges that Kalmanson and his attorneys pursued this discovery with the intention to use the information in the Kalmanson divorce, as opposed to this bankruptcy case. Kalmanson is represented in his divorce action by William Glenn Roy, Jr.[18] and in the pending state court action against the debtor and Nancy Adams by Terry Ackert.

Although it is difficult to precisely parse the wrongs alleged by the debtor in her latter motions for contempt against Kalmanson and his attorneys, in general, the alleged violations focus

---

[17] In these motions, the debtor seeks both civil and criminal contempt findings against Kalmanson and his attorneys.  The respondents filed a Motion to Strike Claims for Criminal Contempt (Doc. No. 710 in Main Case), which was granted. (Doc. No. 726 in Main Case).  As such, the only remaining issue is whether the respondents should be held in *civil* contempt.

[18] Roy has filed both a Motion to Dismiss and a Motion for Summary Judgment (Doc. Nos. 112 and 117 improperly filed in Adversary Proceeding No. 6-35).  Because the issues raised by Roy in these two motions constitute defenses to the debtor's motions, and because an evidentiary hearing on the debtor's motions has concluded, the Court will not separately address these two pending motions and shall deny them as moot, in light of the substantive rulings on the debtor's underlying motions for contempt.

on a sworn statement given by Arlynn Nofziger on April 6, 2007.  (Roy Ex. No. 9).  The statement was taken by Roy before a court reporter and lasted several hours.  The debtor was not invited to participate and, as such, could not ask questions.

The debtor first alleges that Roy asked Arlynn questions to elicit protected information; specifically, Roy inquired into the debtor's current residence.  The debtor next argues that Roy failed to maintain confidentiality by filing Arlynn Nofziger's sworn statement as well as a deposition of Arlynn Nofziger, taken in this bankruptcy case on January 9, 2007, in the Kalmanson divorce case rendering it accessible by the public.[19]  As to these allegations, the Court concludes that both Kalmanson and Roy did violate the terms of the Protective Orders.

After her marriage to Jack Marlow in 2004, the debtor sold her home and moved.  She contends she was forced to move because she feared Rendon could now locate her after Kalmanson released public information connecting her current name to her previous name of Linda Rendon.  Because she expressed fear for the safety of herself and her children, the Protective Orders specifically protected the debtor from answering any question relating to her new residence and prevented Kalmanson or his attorneys from inquiring about the debtor's current address.

Yet, during Roy's examination of Arlynn Nofziger he asked these questions:

Q.    Okay. Do you – again, not trying to violate any order looking for her, but do you know where she is today?" (Page 11, l. 19-21).

Q:    "Based on this do you believe she's living in Tallahassee?" (Page 8, l. 16-17).

Q:    "I'm trying to find her address." (Page 8, l. 19).

---

[19] The debtor makes many other allegations of wrong-doing by Kalmanson and Roy in these contempt motions; however, these additional allegations do not state any violations of the Protective Orders, but merely complain about their actions. For example, the debtor alleges that Arlynn Nofziger was coerced into giving his sworn statement in exchange for Kalmanson's agreement not to add him as a defendant in pending state court litigation.  The debtor herself characterizes these additional allegations as "witness tampering, perjury, obstructing justice, [and] blackmail/extortion."  (Doc. No. 574, p. 8, paragraph 25, in Main Case).  These claims appear to assert possible criminal violations but no violation of the Protective Orders and are well beyond the limited jurisdiction of a bankruptcy court to consider.  As such, the Court will limit its review of the issues raised in the debtor's contempt motions to those allegations that state a possible violation of the Protective Orders.

These questions indicate that Roy knew of the provisions of the Protective Orders, insofar as he stated he was not "trying to violate any order looking for her." At trial, he said he was not aware of the order; however, he did not credibly explain why he made this statement—that he was "not trying to violate any order looking for her"—during the examination. Moreover, even if Roy was unaware of the details of the Protective Order, Kalmanson certainly was aware of the limitations on discovery and should have informed his attorneys of the orders prior to taking any discovery. As such, either Kalmanson or Roy and probably both violated the terms of the Protective Orders by inquiring into the debtor's current residence during Arlynn Nofziger's sworn statement.

Secondly, Roy and Kalmanson violated the terms of the Protective Orders by filing Arlynn Nofziger's earlier deposition in the Kalmanson divorce action on March 9, 2007. The deposition was taken by Kalmanson's bankruptcy lawyer, David McFarlin, in this bankruptcy case in January 2007. The deposition had no connection with Kalmanson's divorce action, and the Protective Orders specifically prohibited parties from using discovery taken in the bankruptcy case in any other forum. Yet, Kalmanson and Roy intentionally violated this restriction.

In defense, Roy argues that the Kalmanson divorce action was sealed from public view at the time Nofziger's deposition/sworn statement was filed. First, whether or not the Kalmanson divorce action was sealed from public view or not is irrelevant. The Protective Orders prevented Kalmanson from using discovery taken in this bankruptcy case in any other forum. He and Roy violated this order. Second, the Lake County file was *not* sealed from public view at the time the Nofziger deposition/sworn statement was filed. Indeed, even Roy's testimony shows the case file was unsealed. Roy testified that he personally had filed a motion to seal the case in April or May 2007,[20] which the state court had not heard as of December 2007. (Trial Tr. pp. 580-82, December 12,

---

[20] A review of the docket in Kalmanson's Lake County dissolution case shows that on March 12, 2007, Roy filed a motion requesting in part "an order sealing the case file" (Ref. 1998) which would have been a futile exercise had the case file already been sealed. (Adv. Pro. No. 06-35, Doc. No. 82, Motion to Dismiss filed by Roy, Exhibit A, containing docket report for Kalmanson's Lake County Dissolution Case, Case No. 99-178-CA01).

2007).  Thus, although portions of the records were sealed[21] on and off during the lengthy history of the Kalmanson divorce, at the time the Nofziger deposition was filed, the divorce action was not sealed and the majority of the file was available to the public.

As such, the Court would find that both Roy and Kalmanson violated the terms of the Protective Orders on at least two (and possibly more) grounds.  Kalmanson connected the debtor to her former identity by filing the decision in the Rendon divorce in both a pending appeal and in his divorce action.  Roy and Kalmanson improperly inquired into the debtor's current residence, and they filed Arlynn Nofziger's deposition testimony in the Kalmanson divorce action.  The debtor failed, however, to demonstrate <u>any</u> violation of the Protective Orders by either McFarlin or Ackert, and the Court will deny the debtor's motions for contempt as to McFarlin and Ackert.

The issues then are whether Roy should be held in contempt of court, whether Kalmanson should be held in further contempt of court, and whether either or both of them should pay damages for violating the Protective Orders, particularly in light that the Court, on further reflection, is vacating the Protective Orders *in toto*.  "It is well established that an order duly issued by a court having subject-matter jurisdiction over a case or controversy before it, and personal jurisdiction over the parties to that case or controversy, must be obeyed, regardless of the ultimate validity of the order." <u>In re Novak</u>, 932 F.2d 1397, 1400 -1401 (11th Cir. 1991) (<u>citing</u> <u>Maness v. Meyers</u>, 419 U.S. 449, 459 (1975); <u>United States v. United Mine Workers</u>, 330 U.S. 258, 293 (1947); <u>United States v. Dickinson</u>, 465 F.2d 496, 509 (5th Cir.1972)). 'People simply cannot have the luxury of knowing that they have a right to contest the correctness of the judge's order in deciding whether to willfully disobey it […]. Court orders have to be obeyed until they are reversed or set aside in an orderly fashion.' <u>Novak</u>, 932 F.2d at 1401 (<u>citing</u> <u>Dickinson</u>, 465 F.2d at 509) (other citations and quotations omitted).

---

[21] Multiple protective orders were entered in Kalmanson's dissolution case, possibly to protect against disclosure of Kalmanson's financial information. These orders did not seal the case file in its entirety, only certain items in the file.

A bankruptcy court's authority to exercise powers of civil contempt is well established. In re Maxair Aircraft Corp. of Georgia, Inc., 148 B.R. 353, 358 (M.D.Ga.1992) (citing In re Power Recovery Systems, Inc., 950 F.2d 798 (1st Cir.1991); In re Skinner, 917 F.2d 444 (10th Cir.1990); In re Walters, 868 F.2d 665 (4th Cir.1989)). Such powers are implied under Bankruptcy Code Section 105(a).[22] Maxair, 148 B.R. at 358. In addition, "Bankruptcy Rule 9020 expressly provides that 'Contempt committed in a case or proceeding pending before a bankruptcy judge ... may be determined by the bankruptcy judge so long as the determination is made at a hearing for which the party subject to sanctions receives sufficient notice." Maxair, 148 B.R. at 358 (citing Bankruptcy Rule 9020(b)).

"In a civil contempt proceeding, the party seeking the contempt bears the initial burden of proving by clear and convincing evidence that the respondent violated a court order." In re Lawrence, 251 B.R. 630, 650 (S.D. Fla. 2000) (citing Commodity Futures Trading Comm'n (CFTC) v. Wellington Precious Metals, Inc., 950 F.2d 1525, 1528 (11th Cir.1992), cert. denied, 506 U.S. 819 (1992); In re Shore, 193 B.R. 598, 601 (S.D.Fla.1996)). "Once a prima facie showing of a violation has been made, the burden of production shifts to the alleged contemnor, who may defend his failure [to comply] on the grounds that he was unable to comply." Lawrence, 251 B.R. at 650 (citing CFTC, 950 F.2d at 1528). To succeed on an inability or impossibility defense, an alleged contemnor must "go beyond a mere assertion of inability and establish that he has made in good faith all reasonable efforts to meet the terms of the court order he is seeking to avoid." CFTC, 950 F.2d at 1529 (internal citations and quotations omitted).

In the Eleventh Circuit, the requirement of establishing that one has made in good faith all reasonable efforts to comply with the order is strictly construed. N.L.R.B. v. Triple A Fire

---

[22] Bankruptcy Code Section 105(a) provides as follows:

> The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

Protection, Inc., 2002 WL 987269 (11th Cir. 2002); Combs v. Ryan's Coal Co., Inc., 785 F.2d 970, 984 (11th Cir. 1986).  A showing that the efforts made to comply were "substantial," "diligent" or "in good faith" alone is insufficient to rebut a prima facie showing of contempt if the contemnor did not make "all reasonable efforts" to comply. Combs, 785 F.2d at 984.  Indeed, the use of a "some effort" standard for measuring the strength of the defense would be an abuse of discretion." Id. (internal citations, quotations and brackets omitted). "If the alleged contemnor makes a sufficient showing of impossibility, the burden of proving ability to comply then shifts to the party seeking to show contempt." Lawrence, 251 B.R. at 650 (citing CFTC, 950 F.2d at 1528).

A bankruptcy court can "sanction those who violate its orders if the sanction imposed is designed to compensate the party in whose favor the court's order ran for the harm caused by the offending party." In re Lickman, 288 B.R. 291, 293 (Bankr. M.D. Fla. 2003) (citing e.g., Jove Engineering, Inc. v. Internal Revenue Service, 92 F.3d 1539, 1559-60 (11th Cir.1996); In re Mroz, 65 F.3d 1567, 1575 (11th Cir.1995)). A bankruptcy court can also "impose sanctions designed to coerce compliance with its orders." Lickman, 288 B.R. at 293 (citing e.g., Lawrence v. Goldberg (In re Lawrence), 279 F.3d 1294, 1297 (11th Cir. 2002); Jove Engineering, 92 F.3d at 1557-59). A bankruptcy court cannot, however, "use the contempt sanction as punishment for violating the court's orders." Lickman, 288 B.R. 291, 293 (citing Jove Engineering, 92 F.3d at 1558 ("distinguishing punitive aspect of contempt as punitive and criminal if it is imposed retrospectively for a completed act of disobedience") (quoting International Union v. Bagwell, 512 U.S. 821, 828 (1994))).

In this very unusual case, we have a party and his attorney who repeatedly violated orders of this Court. Orders of contempt certainly could issue.  However, here, the Court also finds that the orders that the party and his attorney violated likely would not have been entered, if the debtor had originally portrayed the threat she described from her former husband in a more realistic manner.

Both Kalmanson/Roy and the debtor are at fault.  The debtor has erred by either exaggerating the facts underlying her domestic abuse or being unable, for whatever reason, to accurately perceive the facts.  Kalmanson and Roy have erred by knowingly and intentionally violating court orders, simply because they did not agree with their restrictions. In the end, however, the Court declines to issue any further orders of contempt against either Kalmanson or Roy or to assess any sanctions.

First, the debtor suffered no harm or damages from the violations of the Protective Orders. She testified that she moved from the Orlando area in fear for her and her family's safety after Kalmanson initially connected her current name to that of her former married name, Linda Rendon. The debtor, however, offered absolutely no proof of any realistic fear of future harm by Rendon that would justify such an extreme action as relocating. Rather, it appears more likely that the debtor, recently remarried, wanted to escape all of the problems associated with Kalmanson and this bankruptcy case, perhaps in an attempt to start anew.  No credible evidence supports a holding that the debtor was forced to move as a result of Kalmanson's or Roy's actions.

Second, even if the debtor's move was prompted by an unrealistic fear and was tangentially due to the disclosure of confidential information, the debtor has presented no evidence of any loss. She sold her home at a substantial profit.  She valued the home at $330,000 in her Amendment to Schedule C.[23] (Kalmanson Ex. No. 4).  She sold the home for $506,000 in August 2006, netting at least $60,000 in equity to invest in another home. She presented no evidence of any costs associated with her move from Orlando, other than a general statement that she incurred costs.  Such ambiguous testimony cannot support a finding of any damages.  Moreover, the debtor listed inconsequential personal property, valued at $2,000, when she filed bankruptcy.  Even if the debtor

---

[23] Debtor expressly represented that this estimate of her home's value was as of August 12, 2004, and that the value likely had increased.  In January 2006, she listed the home for sale with a suggested purchase price of $799,900. (Kalmanson Ex. No. 7).  The home was encumbered by mortgages totaling $343,000.

did incur some moving costs transporting a small quantity of personal property, the costs would be de minimus.  The debtor has suffered no actual damages as a result of any violation of the Protective Orders.

Third, even if any de minimus damages were incurred, the debtor should not profit from any violation of the Protective Orders.  As held earlier, the Protective Orders were improvidently entered and will be vacated.  The Court initially accepted and supported the debtor's concern about her and her children's safety giving the debtor the later opportunity to substantiate this risk.  After hearing the evidence, however, the Court is convinced that the debtor either intentionally exaggerated or, at a minimum, innocently misperceived the threat posed by her former husband.  In any event, the debtor should not expect others to pay for violations of orders that should never have been entered in the first place.  The Court will deny all of the debtor's motions for contempt. (Doc. Nos. 300, 310, 574, 575, and 689 in Main Case).

Kalmanson's Motion for Sanctions.  Kalmanson also has sought sanctions (Doc. No. 755 in Main Case) under Bankruptcy Rule 9011 against the debtor for seeking additional contempt damages in her amendment to her final motion for contempt. (Doc. No. 689 in Main Case).  In her amended motion, the debtor asserts that Kalmanson and his attorneys violated the Protective Orders by asking Rendon questions designed to elicit confidential information during his deposition on November 15, 2007.

Kalmanson, noting that the deposition of Rendon was authorized by the Court (Doc. No. 642 in Main Case), argues that the debtor's amended motion for contempt was filed "to harass or to cause unnecessary delay or needless increase in the cost of litigation."  The Court finds that the amended motion for contempt was not frivolous and was not filed to harass or increase Kalmanson's litigation costs.  Kalmanson's Motion for Sanctions (Doc. No. 755 in Main Case) is denied.

_Dischargeability Adversary Proceeding_.    The next issue then is whether the debtor owes Kalmanson a debt and whether that debt is dischargeable.[24] Kalmanson filed Adversary Proceeding 6-35 initially asserting a laundry list of reasons why the alleged debts are not dischargeable.  These early allegations essentially mirrored the allegations contained in his State Civil Action against the debtor and Nancy Adams.  However, after ruling on earlier motions to dismiss, the only remaining issue is whether a single count of defamation as pled in Count 2 of Kalmanson's amended complaint is dischargeable.[25]

Kalmanson alleges that Nofziger willfully and maliciously filed, and later supplemented, a police report with the Lake County Sheriff's office containing false information about Kalmanson in order to undermine his personal and financial interests in his pending divorce case. (Doc. No. 24, Ex. A, paragraphs 12 and 16, in Main Case). Kalmanson argues that these alleged wrongs caused him to expend legal fees and costs unnecessarily, damaged his business and personal interests, and harmed his position in the divorce case.  He seeks a judgment against the debtor for the fees, costs, and expenses he incurred as a result of her filing the police report as well as an award of damages for willful and malicious injury, all of which would be nondischargeable under Section 523(a)(6) of the Bankruptcy Code.  In response, the debtor argues that her allegedly defamatory statements in the police report are true and are protected by a qualified immunity.

The police report relates to an incident involving the debtor's younger daughter, then six years old.  On Friday, August 23, 2002, the daughter was waiting at her school bus stop when she was approached by an unknown adult female, who was accompanied by a teenage girl.  The woman knew the child's name, said she was a friend of the debtor, and needed her home phone number.

---

[24] The debtor received a discharge on April 24, 2008.

[25] On January 4, 2007, the Court partially granted and partially denied the debtor's motion to dismiss and held that "the parties shall proceed on Count 2 of the Amended Complaint only as to the statements alleged to be defamatory as contained in the police report attached as an exhibit to the Plaintiff's Amended Complaint."  (Doc. No. 48 in Adversary Proceeding).  The Court earlier had granted another motion to dismiss, but allowed Kalmanson the right to file an Amended Complaint, which he did.  (Doc. No. 43 in Adversary Proceeding).

After the daughter provided her phone number, the woman asked the daughter about her horse, mentioning personal details about the animal.  The woman then drove away.

    The daughter walked home and told her mother about the strange meeting.  The following Monday, August 26, 2002, the debtor filed an Incident Report (the "Incident Report"), providing details about the encounter, calling it "very strange."  (Kalmanson Ex. No. 30).  The debtor told the police officer that her daughter knows all of her friends but that she did not recognize this woman. The debtor was concerned that the woman had gained intimate information about her family, such as her daughter's name and information about her pet horse, and surmised that the incident may relate to the daughter's upcoming testimony in a pending custody dispute.  (The daughter apparently was friends with the Kalmanson children and was scheduled to testify at an upcoming custody hearing in the Kalmanson divorce.)  The debtor did not mention Kalmanson's name in this initial report.

    One month later, on September 26, 2002, the debtor filed a Supplemental Incident Report (the "Supplemental Report"), to which she attached a handwritten "Narrative Continuation."  It is this additional narrative that Kalmanson contends contains defamatory statements.  The debtor wrote that she had spoken with a friend, Nancy Adams, about the incident at the bus stop and asked Adams if she had any information about someone trying to kidnap, abduct, or hurt her daughter.  In response, Adams identified the woman who approached the debtor's daughter as Susan Hawthorne.[26] Hawthorne is an acquaintance of Kalmanson.   According to the debtor, Adams stated that Hawthorne "would do anything for Mitchel Kalmanson including ____ (appears as such in original), or even scaring [the debtor] through [the debtor's] daughter . . ." and that Kalmanson had told Adams he "was going to get [the debtor]" because "he wanted [the debtor] worse than he wanted his ex-wife," Donna.   The debtor's narrative continued:

---

[26] At an earlier hearing held on January 6, 2005, Susan Hawthorne testified that she was not in Lake County on the date the alleged incident occurred.  (Debtor Ex. No. 99, pp. 89-90).

Nancy Adams has heard Mitchel threaten to do something to me and she knows he is capable of it and warned me that he intends to follow thru [sic] on his threats as he hates me worse than his ex-wife. Since he assaulted her by punching her in the face then hitting the ground, pulling a rifle out on her, threatening to his own children and others that she needs to be dead, etc. -- I have no choice to believe that this man has every intention of "killing" or getting rid of me or harming one of my children.

The Lake County Police Department received and filed this additional narrative submitted by the debtor. However, they took absolutely no follow-up action after receiving the Supplemental Report. They did not interview Kalmanson or any other person. The debtor did not share the report with any person other than possibly Nancy Adams, who supplied the additional statements, and Donna. The report was not used in any way in the Kalmanson divorce action or in connection with the custody dispute, although Kalmanson may have gotten a copy of the report and shared it with others, including Susan Hawthorne. It appears that the only person who publically disseminated the report was Kalmanson himself.

Kalmanson claims the defamatory statements by the debtor were made with express malice intending to injure him in order to give Donna an advantage in the pending custody dispute. Kalmanson argues he has incurred presumed damages to his reputation and actual damages for fees and costs incurred defending against the debtor's false allegations.

To prevail under Bankruptcy Code Section 523(a)(6) and prove that any damages the debtor owes to him are not dischargeable, Kalmanson must prove by a preponderance of the evidence that the debtor: 1) deliberately and intentionally, 2) injured Kalmanson or Kalmanson's property, by 3) a willful and malicious act. In re Howard, 261 B.R. 513, 520 (Bankr. M.D. Fla. 2001) (citing 11 U.S.C. § 523(a)(6); Grogan v. Garner, 498 U.S. 279, 287 (1991); Hope v. Walker (In re Walker), 48 F.3d 1161, 1163-65 (11th Cir.1995)). "[A]n injury is willful when the debtor commits an intentional act for the purpose of causing injury or which is substantially certain to cause injury." Howard, 261

B.R. at 520 (citing <u>Walker</u>, 48 F.3d at 1165).[27] An act that is merely reckless is not a "willful act" for

the purposes of Section 523(a)(6). <u>Id.</u>  An act is malicious if it is one which is "wrongful and without

just cause or excessive even in the absence of personal hatred, spite or ill will." <u>Howard</u>, 261 B.R. at

520 (citing <u>Walker</u>, 48 F.3d at 1163-64). Thus, for the purposes of non-dischargeablility, Kalmanson

must show that the debtor deliberately and intentionally injured him by willfully and maliciously

filing a police report defaming him.

     In order to establish the necessary intentional tort, here, defamation, Kalmanson must prove

that the statements the debtor made in the police report are defamatory. Defamation is defined as

"the unprivileged publication of false statements which naturally and proximately result in injury to

another." <u>Wolfson v. Kirk</u>, 273 So.2d 774, 776 (Fla. App. 1973) (<u>citing</u> <u>Cooper v. Miami Herald</u>

<u>Pub. Co.</u>, 159 Fla. 296, 299-300 (Fla. 1947); <u>Delacruz v. Peninsula State Bank</u>, 221 So.2d 772, 775

(Fla. App. 1969). To prove a cause of action for defamation, Kalmanson must demonstrate that: (1)

the debtor published a false statement, (2) about him, (3) to a third party, and (4) the falsity of the

statement injured him.  <u>Bass v. Rivera</u>, 826 So.2d 534, 535 (Fla. 2nd Dist Ct. App. 2002) (<u>citing</u>

<u>Valencia v. Citibank Int'l</u>, 728 So.2d 330, 330 (Fla. 3d Dist Ct. App. 1999)).

     Typically, a showing of malice is required to establish defamation. However, in some

circumstances malice is presumed by the nature of the statement itself. "Actual malice is established

by showing that the publication was made with knowledge that it was false or with reckless

disregard of whether it was false or not." <u>Hoch v. Rissman, Weisberg, Barrett</u>, 742 So.2d 451,

---

[27] Following the <u>Walker</u> decision, the United States Supreme Court clarified the term "willful" contained in Section 523(a)(6), stating that:

    The ⋯ word willful modifies the word injury, indicating that nondischargeability takes a deliberate or intentional injury, not merely ⋯ a deliberate or intentional act that leads to injury⋯⋯ Moreover, § 523(a)(6)'s formulation triggers in the lawyer's mind the category intentional torts, as distinguished from negligent or reckless torts. Intentional torts generally require that the actor intend the consequences of an act, not simply the act itself.

<u>Kawaauhau v. Geiger</u>, 523 U.S. 57, 57-58 (1998) (internal quotations omitted).

460 (Fla. 5th Dist. Ct. App. 1999) (citations omitted).[28]  However, no showing of malice is required

where a statement is considered actionable *per se*. <u>Wolfson</u>, 273 So.2d at 776.  A "communication is

actionable *per se. . .* if it imputes to another . . . a criminal offense amounting to a felony… or

conduct, characteristics or a condition incompatible with the proper exercise of his lawful business,

trade, profession or office…"  <u>Id.</u> (citing <u>Campbell v. Jacksonville Kennel Club</u>, 66 So.2d 495, 497

(Fla. 1953)).[29]  Here, the debtor stated that she feared that Kalmanson would attempt to murder or

harm her or her children, and, as such, has imputed a possible future criminal offense amounting to a

felony.  Although here the alleged criminal act had not yet occurred, the Court still will apply the

higher standard and find the statements are actionable *per se*, unless protected by some type of

immunity.

    Certain published statements are privileged and therefore are immune from attack as

defamatory.  "Traditionally, defamatory statements made in the course of judicial proceedings are

absolutely privileged, no matter how false or malicious the statements may be, so long as the

statements are relevant to the subject of inquiry." <u>Levin, Middlebrooks, Mabie, Thomas, Mayes &</u>

<u>Mitchell, P.A. v. U.S. Fire Ins. Co.</u>, 639 So.2d 606, 607-608 (Fla. 1994) (citing <u>Fridovich v.</u>

<u>Fridovich</u>, 598 So.2d 65 (Fla. 1992)).  "Consequently, the torts of perjury, libel, slander, defamation,

and similar proceedings that are based on statements made in connection with a judicial proceeding

are not actionable." <u>Levin</u>, 639 So.2d at 608 (citing <u>Wright v. Yurko</u>, 446 So.2d 1162 (Fla. 5th Dist.

Ct. App. 1984)).

    In this case, the debtor's Supplemental Report was not made "in the course of" any ongoing

judicial proceeding and was made prior to any formal criminal charges being lodged against

---

[28] Under <u>Kawaauhau v. Geiger</u>, however, a statement made in reckless disregard of its truth or falsity may not suffice to
render a resultant debt non-dischargeable.

[29] In <u>Nodar v. Galbreath</u>, 462 So.2d 803, 812 (Fla.1984), the Florida Supreme Court cited two cases as examples of
"where the false and defamatory words themselves were so extreme as to intrinsically show express malice." 462 So.2d
at 812 (citing <u>Loeb v. Geronemus</u>, 66 So.2d 241 (Fla.1953) ("defendants said plaintiff was guilty of evil conduct, was of
low moral character, was a disgrace, a troublemaker, was not respectable, had been compelled to leave Chicago") and
<u>Brown v. Fawcett Publications, Inc.</u>, 196 So.2d 465 (Fla. 2d Dist Ct. App. 1967) ("defendant said plaintiff was a
murderer, rapist, and sodomite").

Kalmanson. (Of course, no charges ever were filed and neither the debtor nor her family ever was harmed.)  In <u>Fridovich</u>, the Supreme Court of Florida held that while "defamatory statements made in the course of judicial proceedings are absolutely privileged, defamatory statements made to the authorities *prior* to the institution of criminal charges were only entitled to a qualified immunity. . ." <u>Green Leaf Nursery v. E.I. DuPont De Nemours and Co.</u>, 341 F.3d 1292, 1303 (11th Cir. 2003) (emphasis in original) (<u>citing</u> <u>Fridovich</u>, 598 So.2d at 66, 68-69). Specifically, "a statement made to an investigating officer *preliminary to the filing of a criminal charge* carrie[s] only a qualified privilege." <u>Stucchio v. Tincher</u>, 726 So.2d 372, 374 (Fla. 5th Dist Ct. App. 1999) (emphasis in original); <u>Border Collie Rescue, Inc. v. Ryan</u>, 418 F.Supp.2d 1330, 1348 (M.D.Fla.2006) ("Voluntary statements made by private individuals to police in furtherance of an investigation are clothed in a qualified privilege.") (<u>citing</u> <u>Fridovich</u>, 598 So.2d at 69). A qualified privilege exists where a statement was published: (1) in good faith; (2) concerning an interest in the subject by the speaker or a subject in which the speaker has a duty to speak; (3) to a listener or reader with a corresponding interest or duty; (4) on a proper occasion; and (5) in a proper manner. <u>Thomas v. Tampa Bay Downs, Inc.</u>, 761 So.2d 401, 404 (Fla.App. 2 Dist.2000) (<u>citing</u> <u>Nodar</u>, 462 So.2d at 809; <u>American Ideal Management v. Dale Village</u>, 567 So.2d 497 (Fla. 4th Dist. Ct. App. 1990)).

A statement made to a police officer prior to lodging formal charges may constitute defamation, if the elements of qualified immunity are not proven. "To overcome a qualified privilege, a plaintiff has to show by a preponderance of the evidence that the defamatory statements were false and uttered with common law express malice." <u>Border Collie Rescue</u>, 418 F.Supp.2d at 1348 (<u>citing</u> <u>Fridovich</u>, 598 So.2d at 69). Express malice exists where the primary motive for the statement is an intention to injure the plaintiff. <u>Thomas</u>, 761 So.2d at 404 (<u>citing</u> <u>Nodar</u>, 462 So.2d at 806 (<u>citing</u> <u>Loeb v. Geronemus</u>, 66 So.2d 241 (Fla. 1953))).

As explained by the Florida Supreme Court in <u>Nodar</u>:

> Where a person speaks upon a privileged occasion, but the speaker is motivated more by a desire to harm the person defamed than by a purpose to protect the personal or social interest giving rise to the privilege, then it can be said that there

was express malice and the privilege is destroyed. Strong, angry, or intemperate words do not alone show express malice; rather, there must be a showing that the speaker used his privileged position to gratify his malevolence. If the occasion of the communication is privileged because of a proper interest to be protected, and the defamer is motivated by a desire to protect that interest, he does not forfeit the privilege merely because he also in fact feels hostility or ill will toward the plaintiff. The incidental gratification of personal feelings of indignation is not sufficient to defeat the privilege where the primary motivation is within the scope of the privilege.

Nodar, 462 So.2d at 811-812 (internal citations and quotations omitted).

A showing of egregious facts can suffice to demonstrate express malice sufficient to strip a communication of qualified immunity. Green Leaf Nursery, 341 F.3d at 1303 (citing Fridovich, 598 So.2d at 66, 68-69). In Fridovich, for example, "after a son killed his wealthy father, the authorities determined that the death was accidental. The other son, unhappy with his share of the estate, conspired with his other relatives to have his brother charged with first degree murder. After a stress analyzer was used to see which relative could lie better, the sister and her former husband were chosen to make false and malicious statements in order to convince the police to reopen the investigation." Stucchio v. Tincher, 726 So.2d 372, 374 (Fla. 5th Dist Ct. App. 1999) (summarizing Fridovich). Facts such as these would be sufficiently egregious to overcome a qualified immunity. However, no liability will attach where a statement is "published upon an occasion that makes it qualifiedly privileged and the privilege was not abused." Thomas v. Tampa Bay Downs, Inc., 761 So.2d 401, 404 (Fla.App. 2 Dist.2000) (citing Nodar, 462 So.2d 803; Restatement (Second) of Torts, § 593 (1976)).

Applying these standards to the statement made by the debtor to the Lake County Police on September 26, 2002, the debtor filed the supplemental narrative statement after a friend, Nancy Adams, gave her reason to suspect that Kalmanson was behind the strange bus stop encounter involving her six-year old daughter.  Adams specifically told her that the woman who approached her daughter was a friend of Kalmanson's and that Kalmanson had threatened harm to the debtor and her family.

Nancy Adams is not a credible source of information and could have been lying in making these statements to the debtor. After viewing Nancy Adams during her trial testimony and weighing the frequent inconsistencies in her testimony, the Court indeed would find her less than truthful. The fact is, however, that Nancy Adams *did* tell the debtor these stories about Kalmanson and Hawthorne—that Hawthorne was trying to scare her daughter and that Kalmanson was quite angry and perhaps vindictive to the debtor, possibly threatening physical harm for the assistance the debtor gave to Donna.

The issue then is whether the debtor took this information to the Lake County Police Department out of express malice or in good faith. Here, the debtor, the mother of two young daughters, was told that the woman at the bus stop incident was a friend of Kalmanson and that Kalmanson was a threat to her and her children. In September 2002, the debtor had only known Donna, Kalmanson's former wife, for a few months. She was helping Donna in her litigation against Kalmanson, but, had not yet immersed herself in the animosity between the parties to the degree it has achieved in 2008. Therefore, even if the debtor disliked Kalmanson, it is hard to question that filing the supplemental report was appropriate, given the seriousness of the information conveyed to her by Nancy Adams. What mother would not file such a report if she perceived a legitimate threat to her children? The debtor filed the report in good faith, regardless of any additional ill-will or hostility she may have held against Kalmanson at the time.[30]

As to the remaining factors needed to determine if the debtor is entitled to rely on qualified immunity in making the Supplemental Report, the Court would find the debtor clearly had an

---

[30] The debtor attempted to prove Kalmanson was violent because he had a history of domestic abuse during his marriage to Donna. Kalmanson admitted that a physical altercation occurred between him and Donna on April 30, 2001, that he was arrested as a result, and that adjudication was withheld. He claims he was acting in self-defense. (Trial Tr. pp. 609-10, December 13, 2007). To provide greater details of this domestic dispute, the debtor sought to introduce the Arrest Affidavit/First Appearance Form from Lake County, Florida, showing that Kalmanson was arrested for simple domestic battery of Donna Robinson on April 30, 2001, and that a psychological evaluation and anger management classes were ordered on June 28, 2001, following Kalmanson's plea of nolo contendere. (Debtor Ex. No. 39). At the conclusion of the trial in this matter, this Court took the issue of the admissibility of this exhibit under advisement and now denies the request. First, evidence of a plea of nolo contendere is not admissible against the defendant who made the plea in any civil or criminal proceeding. Fed. R. Evid. 410. Second, the exhibit is replete with inadmissible hearsay. Fed.R.Evid. 801(b) and (c). Debtor's Exhibit Number 39 will not be admitted.

interest in the subject and a duty to speak.  She was trying to protect herself and her children from a

perceived threat.   She provided her narrative to the proper law enforcement agency, which,

obviously, had a corresponding duty to receive the report.  She made the report shortly after learning

the additional information from Nancy Adams on a proper occasion and in a proper manner.  As

such, the debtor has established that she had a qualified immunity to file the Supplemental Report.  It

cannot serve as a basis for defamation.

Kalmanson has failed to establish that her statements were defamatory or gave rise to any

non-dischargeable debt.  He has failed to prove that the debtor deliberately and intentionally injured

him or his property by any willful and malicious act.  Judgment will be entered in favor of the debtor

and against Kalmanson in Adversary Proceeding 6-35.

Kalmanson's Proof of Claim and Debtor's Objection (Doc. Nos. 77 and 98 in Main Case).

Kalmanson filed Proof of Claim Number 5 in the debtor's bankruptcy case alleging she owed him

$1,985,250.40. The claim stated that the unsecured debt arose from a "Lawsuit-No Final Judgment-

damages not finalized."   Kalmanson swore that the debt was incurred on October 31, 2003.

Kalmanson failed to explain how he calculated the precise damages he sought or how he determined

the date the debt arose.   He did attach a copy of the First Amended Complaint for Damages,

Injunction, and Other Relief filed against the debtor and Nancy Adams in the State Civil Action.

Bankruptcy Rule 3001(f) provides that a properly executed and filed proof of claim[31]

constitutes prima facie evidence of the validity and amount of the claim.[32] Section 502(a) of the

Bankruptcy Code provides that a proof of claim is "deemed allowed," unless a party in interest

objects. Section 502(b) states that, once an objection is lodged, the court "after notice and a hearing,

---

[31] In order to be executed and filed in accordance with the bankruptcy rules, "the claim must be in writing, substantially
conform to Official Form 10…be executed by the creditor or the creditor's agent" and, where "the claim is based on a
writing, a copy or summary of the writing must be filed with the proof of claim." In re Habiballa, 337 B.R. 911,
915 (Bankr.E.D.Wis.2006) (citing In re Cluff, 313 B.R. 323, 332 (Bankr. D. Utah 2004).

[32] As Judge Briskman held in In re Sandifer, 318 B.R. 609, 611 (Bankr.M.D.Fla.2004), Bankruptcy Rule 3001(c) is
designed to provide the debtor with "fair notice of the conduct, transaction, and occurrences that form the basis of the
claim."

shall determine the ... claim[.]" Upon a dispute or objection concerning a proof of claim, the burden

of proof:

> …shifts to the objecting party to produce evidence at least equal in probative
> force to that offered by the proof of claim and which, if believed, would refute at
> least one of the allegations that is essential to the claim's legal sufficiency. This
> can be done by the objecting party producing specific and detailed allegations that
> place the claim into dispute, by the presentation of legal arguments based upon
> the contents of the claim and its supporting documents . . . in which evidence is
> presented to bring the validity of the claim into question. If the objecting party
> meets these evidentiary requirements, then the burden of going forward with the
> evidence shifts back to the claimant to sustain its ultimate burden of persuasion to
> establish the validity and amount of the claim by a preponderance of the evidence.

In re Taylor, 363 B.R. 303, 307 -308 (Bankr.M.D.Fla.2007) (quoting Armstrong, 320 B.R. at 104

(citing In re Rally Partners, L.P., 306 B.R. 165, 168-169 (Bankr.E.D.Tex.2003) (citations omitted))).

The debtor has objected to Kalmanson's proof of claim asserting she has no liability to him.

(Doc. No. 77 in Main Case).  Kalmanson filed a response to the objection stating the debtor "is

indebted to him in the amount of $1,985,250.40."  (Doc. No. 98 in Main Case). Kalmanson also

inexplicably asserts that the debt is non-contingent and liquidated, yet the claim only attaches the

amended complaint filed but unresolved in the State Civil Action.

During trial, Kalmanson introduced a plethora of evidence that the debtor committed various

bad acts when she assisted Donna in the Kalmanson divorce.  For example, Kalmanson argues that

the debtor conducted investigations of witnesses, judges, attorneys, and the facts related to the

Kalmanson divorce and that the debtor engaged in various criminal actions such as illegally

obtaining private insurance/medical records of third parties, engaging in the unauthorized practice of

law by helping Donna draft legal pleadings, and wrongfully recorded phone conversations between

Kalmanson and his children.

Given the broad brush presentation by Kalmanson at trial and in his post-trial brief, the Court

has difficulty discerning exactly the basis for Kalmanson's claim against the debtor other than she

exceeded the bounds of propriety in assisting Donna.  Kalmanson apparently argues that, as a result

of these bad actions, which he calls "litigation terrorism," the debtor is responsible for all of the legal

fees and costs he incurred over the past six years, including all fees and costs in his divorce as well as fees and costs incurred in non-litigation matters, such as during an investigation by the Internal Revenue Service.  He also seeks other unspecified damages.

Kalmanson, however, has failed to substantiate even one dollar of damage he has suffered. Kalmanson sought exactly $1,985,250.40 in damages from the debtor in his proof of claim.  At trial, Kalmanson offered varying estimates of his damages.  At page 602 of the trial transcript, he states, "It's cost me millions of dollars to defend myself."  At page 629, he states, "I have spent hundreds of thousands of dollars to vindicate myself from these false allegations made by the debtor and her judicial terrorists."  At page 635, he states that he spent "thousands, or hundreds of thousands to [sic] dollars to defend these false allegations."  At page 636, he states he paid his bankruptcy lawyer "two hundred something some thousand dollars, plus whatever it's going to cost for this trial week…I've had Terry Ackert's help, probably another $200,000, $250,000 there.  I had Jim Monroe previously, that cost me probably – *I don't have exacts*, Judge, *but these are estimates*, probably $75,000 roughly…I would say close to $675,000."  (Emphasis added.)  At page 642, Kalmanson testified, "I forgot to include…but there was probably another $200,000 of fees from Carlton Fields having to defend these allegations."    In his post-trial brief, Kalmanson seeks damages of $350,000, but he offers no explanation at how he arrived at this new damage number.

Kalmanson failed to establish the amount of attorney fees and costs he incurred.  He did not produce a single billing statement from any attorney supporting his fluctuating damage estimates or explaining the services his attorneys provided.  He failed to introduce a single check he paid to any professional for services rendered.  He did not introduce any type of third-party testimony or evidence to substantiate that any action taken by the debtor damaged his reputation or his relationship with his children.

Kalmanson could not identify by name a single neighbor, friend, customer, or business acquaintance to whom the debtor made negative statements about Kalmanson (Trial Tr. p. 649, December 13, 2007).  He could not identify even one customer who cancelled any business with him

as a result of the debtor's conduct, testifying "[i]t's impossible to disprove the negative and impossible to know clients that don't call." (Trial Tr. p. 696, December 13, 2007).   Kalmanson did not establish any additional attorney fees or damages he suffered in connection with his divorce action or otherwise as a result of the debtor's assistance given to his former wife, Donna.   He simply argues the debtor is responsible for all the attorney fees and costs he has incurred.

In sum, Kalmanson has failed to prove any damages, regardless of whatever actions the debtor may or may not have taken.   He also has failed to establish that the debtor would be responsible for these fees and costs.   As such, the Court sustains the debtor's objection to Kalmanson's proof of claim and disallows the claim in full.

<u>Kalmanson's Testimony - Court's Order to Show Cause.</u>   On September 6, 2007, the Court entered an order directing Kalmanson to attend his deposition at a mutually convenient time no later than October 26, 2007.  (Doc. No. 608 in Main Case). The deposition started on October 25, 2007; however, the deposition was prematurely stopped after approximately 40 minutes due to Kalmanson's refusal to answer direct questions.  He also prominently displayed a large picture of Rendon and the debtor during the deposition, apparently in an attempt to intimidate the debtor. The transcript of this partial deposition confirms that Kalmanson was evasive, rude, and refused to answer simple questions, such as providing his name, address, and telephone number.  (Debtor Ex. No. 1 admitted at hearing held on November 27, 2007).  He, not his attorney, interposed repeated, inappropriate objections to questions.

The debtor next made an <u>ore tenus</u> motion to complete Kalmanson's deposition, which the Court granted in an order entered on October 29, 2007. (Doc. No. 642 in Main Case).   In this order, Kalmanson was directed to attend a continued deposition to be held in the courthouse, commencing at 9:00 a.m. on November 27, 2007.  The Court further directed the parties "to act civilly toward one another" and warned that "[s]anctions shall be assessed for any instance of uncooperative or inappropriate behavior during the deposition, including the possible striking of pleadings or limiting evidence parties can present during trial."

Kalmanson arrived early for his scheduled deposition on November 27, 2007.  Before the debtor even arrived, however, Kalmanson accused the court reporter of unprofessional conduct.  By all accounts, even that of his own attorney, Kalmanson accused the court reporter of bias and having a bad attitude towards him.  The court reporter, still in tears, testified that Kalmanson then threatened her and stated, "Do not let that happen again."

The Court finds that the court reporter is a well-respected member of the legal community, objective, and very professional.  The Court further finds that the court reporter's testimony was credible and that she felt threatened and unable to do her job appropriately due to Kalmanson's demeanor and insinuations.  Obviously, she was unable to complete the deposition.

Concluding that Kalmanson's behavior was intended to subvert any legitimate efforts by the debtor to take his deposition, the Court, on November 27, 2007, issued an Order to Show Cause (Doc. No. 671 in Main Case) to allow him to explain why he had flagrantly disregarded the order of this Court directing him to attend his deposition and to act civilly and to cooperate with the debtor. (Kalmanson did eventually cooperate with the debtor and completed his deposition before another court reporter later on November 27, 2007.  (Debtor Ex. No. 115)).  The evidentiary hearing on the Order to Show Cause was consolidated with all of the other issues heard during the trial.

At trial, Kalmanson offered no explanation for his behavior.  He never mentioned the depositions or provided any justifications for his refusal to answer questions or for his intimidation of the court reporter.  As such, in the absence of any evidence to the contrary, the Court must assume he has no defense for his actions.  (Doc. No. 679 in Main Case).

Bankruptcy Rule 7037, which incorporates Rule 37(b)(2) of the Federal Rules of Civil Procedure, provides that if a party fails to obey a court order to provide or to permit discovery, the court in which the action is pending "may make such orders in regard to the failure as are just" and can require the party, and possibly the involved attorneys, to pay reasonable expenses, including attorney's fees, caused by the failure.  Although sanctions can include designating facts as established for the purposes of the litigation, refusing to allow the party to testify or present

evidence, striking pleadings or dismissing claims for relief, such stringent sanctions properly are reserved for situations "where the party's conduct amounts to flagrant disregard and willful disobedience of discovery orders." <u>United States of America v. Certain Real Property Located at Route 1, Bryant, Alabama</u>, 126 F.3d 1314, 1317 (11th Cir. 1997)(<u>citing</u> <u>Buchanan v. Bowman</u>, 820 F.2d 359, 361 (11th Cir. 1987)).

The debtor, after two attempts, eventually was able to complete her deposition of Kalmanson. As such, the Court will refrain from issuing such stringent sanctions as disregarding Kalmanson's testimony or striking his pleadings.   Justice requires, however, that Kalmanson face some consequence for his obstructionist and improper actions, particularly of intimidating a court reporter to the extent she had to terminate the deposition.   The appropriate sanction is for Kalmanson to reimburse the debtor for all costs she incurred in taking his deposition, including all court reporter and transcription costs.

Accordingly, the debtor is directed to file an affidavit listing all court reporter and transcription costs she incurred in connection with taking Kalmanson's deposition and attaching supporting documents, such as invoices and payment checks, within 30 days of the entry of this order.  Kalmanson shall have 15 days after the debtor's affidavit is filed to lodge any objection to the requested costs or to timely pay the requested amounts.  If a timely objection is filed, the Court will consider the dispute without further hearing and will issue an appropriate order.

<u>Kalmanson's Motion to Pursue Discovery from Rendon</u>.   On November 15, 2007, Kalmanson's attorneys deposed Ruben Rendon.  The deponent was very uncooperative and refused to answer multiple questions, offering no legal basis for his refusal. Kalmanson argues that he needs Rendon to fully answer the deposition questions in order to fully present his case in this bankruptcy case. Kalmanson, therefore, seeks an order allowing him to pursue a finding of contempt against Rendon, awarding sanctions, and compelling Rendon to answer the deposition questions.  (Doc. No. 681 in Main Case).

In the Response (Doc. No. 686 in Main Case), the debtor objects to the completion of Rendon's deposition, citing the same safety concerns discussed earlier in this Memorandum Opinion. Further, the debtor argues that during the deposition Kalmanson's attorneys improperly attempted to "anger and enrage" Rendon (Doc. No. 686, ¶ 7 – 9, in Main Case). The debtor thus opposes the Motion and requests an order enjoining Kalmanson and his attorneys from further communications with Rendon.

"Parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action ... The information sought need not be admissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence." Fed.R.Civ.P. 26(b)(1). "[A] district court can deny a motion to compel further discovery if it concludes that the questions are irrelevant." Jerome v. Marriott Residence Inn Barcelo Crestline/AIG, 211 Fed.Appx 844, 848 (11th Cir. 2006) (citing Commercial Union Ins. Co. v. Westrope, 730 F.2d 729, 732 (11th Cir.1984).

Here, Rendon's testimony, as contained in the existing deposition transcript, was relevant and sufficiently complete to allow the Court to rule on all pending motions and matters. For example, Rendon's statements that he wanted nothing further to do with the debtor were very helpful in concluding that she and her family face no current threat of harm from him. Additional testimony of Rendon, however, would not assist in the resolution of any issue. To allow the parties to dredge up the details of domestic violence claims that occurred in 1992 and early 1993 would serve no purpose and may indeed serve to enflame Rendon anew. As such, Kalmanson's Motion for Relief from Seal and Discovery Orders to File Motion for Contempt against Alleged Abuser is denied. (Doc. No. 681 in Main Case).

Kalmanson's Post-Trial Motion to Amend Complaint.    Both the debtor and Kalmanson have filed numerous post-trial motions.  The Court will consider each of them in turn, starting with Kalmanson's motion to amend the already amended complaint to conform to the evidence filed in the related Adversary Proceeding 6-35.  (Doc. No. 138 in Adversary Proceeding).

In this motion, Kalmanson seeks to assert two new counts in the pending adversary proceeding to make any debt due by the debtor to him non-dischargeable under Section 523(a)(6) of the Bankruptcy Code.    Kalmanson argues that, because the debtor did not object at trial to the introduction of evidence relating to these newly alleged counts, he should be allowed to amend the pleadings to conform to the evidence pursuant to Federal Rule of Civil Procedure 15.[33]

In order to understand the history of this renewed request to add claims to Kalmanson's dischargeability adversary proceeding, some understanding of the procedural history is needed.  On January 26, 2006, Kalmanson filed a complaint seeking an exception to discharge pursuant to Section 523(a)(6) of the Bankruptcy Code. The initial complaint asserted no formal counts, but alleged a laundry list of "Offending Activities" allegedly giving rise to non-dischargeable debt pursuant to Section 523(a)(6). (Doc. No. 1 in Adversary Proceeding).  The debtor filed a motion to dismiss the initial complaint (Doc. No. 7 in Adversary Proceeding) on March 7, 2006, and filed an Amended Motion to Dismiss the Initial Complaint and/or For a More Definite Statement (Doc. No. 16 in Adversary Proceeding), which this Court granted on June 28, 2006 (Doc. No. 19 in Adversary Proceeding).  Kalmanson was given the opportunity to file an amended complaint.

On July 14, 2006, Kalmanson filed an amended complaint (Doc. No. 24 in Adversary Proceeding) again seeking a discharge exception pursuant to Section 523(a)(6) but this time asserting three formal counts: "Conspiracy to Commit Criminal Practices" (Count 1);  "Defamation" (Count 2); and "Conspiracy to Commit Defamation" (Count 3).  On August 4, 2006, the debtor filed a Motion to Dismiss the Amended Complaint with Prejudice (Doc. No. 26 in Adversary Proceeding) and later filed an Amended Motion to Dismiss (Doc. No. 30 in Adversary Proceeding) that Kalmanson opposed (Doc. No. 32 in Adversary Proceeding). On November 27, 2006, the Court issued a lengthy memorandum opinion explaining that Counts 1 and 3 of the Amended Complaint

---

[33] Bankruptcy Rule 7015 states that Rule 15 of the Federal Rules of Civil Procedure applies in adversary proceedings.

failed to state a cause of action, dismissing those counts, and allowing only Count 2, the defamation count, to proceed to trial.[34] (Doc. Nos.  42, 43, and 48 in Adversary Proceeding).

Eleven months later, on October 26, 2007, not long before the trial on remaining Count 2 was scheduled to begin, and on the same day the Court ordered that all discovery be completed (Doc. No. 86 in Adversary Proceeding),[35] Kalmanson filed a Motion seeking leave to file a Second Amended Complaint (Doc. Nos. 98 and 101 in Adversary Proceeding) and attached a copy of a proposed Second Amended Complaint to the Motion. In the proposed Second Amended Complaint, Kalmanson repeated the defamation count (Count 2) and sought to plead counts for "Civil Remedy for Criminal Practices" (Count 1) and "Extreme and Outrageous Conduct" (Count 3). These "newly" pled counts really are just restatements of the allegations previously dismissed from Kalmanson's prior two complaints.   On December 12, 2007, referencing its prior rulings, the Court denied Kalmanson's third attempt to add counts previously dismissed twice before, again finding the counts failed to state a claim upon which relief can be granted. (Doc. Nos. 129 and 130 in Adversary Proceeding).

In December 2007, the Court held a five-day trial addressing the numerous consolidated matters as well as the trial on the single, limited count for defamation (Count 2) raised in Adversary Proceeding 6-35 and addressed earlier in this Opinion. Now, in Kalmanson's current motion, he tries yet again to amend the adversary proceeding complaint, arguing that he should be allowed to raise the identical counts ("Civil Remedy for Criminal Practices" (Count 1), and "Extreme and

---

[34] The defamation count originally encompassed statements allegedly made by the debtor in connection with claims of animal abuse by Kalmanson and in a police report filed by the debtor. However, prior to trial, the defamation count was limited only to the statements allegedly made in connection with the police report. Specifically, in an order (Doc. No. 48 in Adversary Proceeding) granting Debtor's Motion for Clarification (Doc. No. 46 in Adversary Proceeding), the Court found that "The allegation contained in ¶12(f) of the Amended Complaint (Doc. No. 24 in Adversary Proceeding) that sometime in the year 2002 the Debtor gave an unidentified statement to an unidentified person relating to animal abuse is not sufficient to state a cause of action for defamation." Thus, the defamation count (Count 2) was tried on the limited issue of whether statements contained in a police report filed by the debtor were defamatory.  Earlier in this Opinion, the Court held these statements were not defamatory.
[35] On July 24, 2007, the Court entered an order consolidating discovery issues relating to the debtor's three pending motions for contempt/sanctions (Doc. Nos. 300, 310, and 410 in the Main Case) with this adversary proceeding for discovery purposes only. (Doc. No. 76 in Adversary Proceeding).

Outrageous Conduct" (Count 3)) the Court recently precluded.  (Doc. Nos. 129 and 130 in Adversary Proceeding).  Kalmanson argues, relying on Federal Rule of Civil Procedure 15, that he should now be allowed to assert these additional counts because the debtor failed to object to the admission of evidence relating to the allegations during trial.

As relevant, Federal Rule of Civil Procedure 15[36] governs amendments and supplemental pleadings during and after trial and provides that:

> When an issue not raised by the pleadings is tried by the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings. A party may move—at any time, even after judgment—to amend the pleadings to conform them to the evidence and to raise an unpled issue. But failure to amend does not affect the result of the trial of that issue.

Fed. R. Civ. P. 15(b)(2).

The cases Kalmanson cites each stand for the proposition that post-trial amendments to pleadings can be appropriate if evidence is presented on an *unpled* claim during trial and a party fails to object. In re Harris, 203 B.R. 117 (Bankr. N.D. Ill. 1996); Winger v. Winger, 82 F.3d 140 (7th Cir. 1996); In re Rivinius, Inc., 977 F.2d 1171 (7th Cir. 1992).  The relevant inquiry is whether the party had knowledge of the issue(s), a fair opportunity to present a defense to the issue(s), and failed to object to evidence admitted on the issue(s). Where those circumstances are present, a party can be found to have consented to a trial on the issue(s).

Here, the two counts Kalmanson seeks to belatedly add were not unpled.  Kalmanson had attempted to add the exact same two counts shortly before trial.  The Court denied the request.  (Doc. Nos. 129 and 130 in Adversary Proceeding).  Rule 15 certainly does not allow a party who was expressly prevented from adding additional allegations to the pleadings to later introduce evidence that may support these allegations and then argue the amendment is appropriate to allow the pleadings to conform to the evidence.  A party cannot belatedly amend pleadings post-trial that were expressly precluded before or during the trial.

---

[36] In the Motion to Conform, Kalmanson erroneously cited an outdated version of Federal Rule of Civil Procedure 15. The correct version of Rule 15 quoted herein went into effect on December 1, 2007.

Nor could the debtor have given any implied consent to the trial of these additional allegations.  The debtor rightfully could rely on this Court's order that the new counts were not included in the issues to be decided at the trial.  The determination of whether to allow a post-trial amendment to a complaint is a matter of the Court's discretion.  In re Parkhurst, 202 B.R. 816, 819-820 (Bankr.N.D.N.Y.1996) (citing Matter of Gross, 175 B.R. 277, 283 (Bankr.N.D.Ind.1994) (other citation omitted). Normally, if an unpled cause of action is tried by express or implied consent of the defendant "the pleading may be deemed amended to conform." Parkhurst, 202 B.R. at 819-820 (citing In re Chryst, 177 B.R. 486, 497 (Bankr.E.D.Pa.1994) quoting Schultz v. Cally, 528 F.2d 470, 474 (3d Cir.1975) (citation omitted)).  However, where a pro se party fails to object to evidence presented on an issue, such failure should not be deemed tantamount to impliedly consenting to a trial on that issue. Wallace v. Hanover Ins. Co. of New York, 164 So.2d 111, 118 (La.App.1964) citing United States v. Hauck, 155 F.2d 141, 147 (2nd Cir. 1946) (in a denaturalization case, "implied consent to the trial of an issue not raised by the pleadings should not be found where . . . the defendant was not represented by counsel and his attention was in no way directed to the significance of the testimony on an issue outside the pleadings."); but cf. In re Parkhurst, 202 B.R. 816, 819-820 (Bankr.N.D.N.Y.1996) (permitting amendment where debtor was acting pro se, but was not unduly prejudiced by the amendment). This is particularly true in a case such as this where the evidence presented without objection was also relevant to the claims that were pled.

A party, whether represented or not, cannot give implied consent to expanded claims added post-trial if the introduced evidence that supports the new counts *also* goes to the proof of other issues to be decided during the trial.  Wesco Mfg., Inc. v. Tropical Attractions of Palm Beach, Inc., 833 F.2d 1484, 1487 (11th Cir. 1987) ("The introduction of evidence arguably relevant to pleaded issues cannot serve to give a party fair notice that new issues are entering the case.") (citing Jimenez v. Tuna Vessel "Granada", 652 F.2d 415, 421 (5th Cir. Unit A 1981); International Harvester Credit Corp. v. East Coast Truck, 547 F.2d 888, 890 (5th Cir.1977)); Pariser v. Christian Health Care Systems, Inc., 816 F.2d 1248, 1253 (8th Cir. 1987) (where evidence is relevant to pled claims and an

unpled claim, defendant lacked notice of the unpled claim, therefore denying leave to amend was not

an abuse of discretion) (<u>citing</u> <u>Gallon v. Lloyd-Thomas Co.</u>, 264 F.2d 821, 825 n. 3 (8th Cir.1959)

("Evidence going to other issues, even if incidentally touching some elements of [the unpleaded

claim], may not be used to support the proposed amendment.")); <u>In re Burghoff</u>, 374 B.R. 672,

678 (Bankr. N.D. Iowa 2007) (where evidence was presented relevant to both a pled and an unpled

claim, "[d]ebtor lacked notice, making an amendment to conform to the evidence inappropriate.").

Here, Kalmanson asserts that all of the evidence about the debtor's bad actions goes solely to

prove the two new counts he seeks to add to Adversary Proceeding 6-35.  However, the very same

evidence also is directly relevant to the allowance of Kalmanson's proof of claim.  The underlying

facts go both to the debtor's liability to Kalmanson, as asserted in his proof of claim, and also, if

allowed, to the re-pled counts Kalmanson seeks to add to the adversary proceeding.  In reality, all the

new counts do is try to make some portion of Kalmanson's claim non-dischargeable.  Because the

evidentiary hearing considered the allowance of Kalmanson's proof of claim and the debtor's

objection to the claim, and because the evidence relating to the expansion of the counts in the

dischargeability adversary proceeding is the same, the debtor could not have impliedly consented to

the expansion of the adversary proceeding.  For all of these reasons, Kalmanson's renewed attempt

to expand the counts asserted in Adversary Proceeding 6-35 is denied. (Doc. No. 138 in Adversary

Proceeding).

<u>Kalmanson's Post-Trial Motion to Exclude Evidence of Alleged Abuse</u>.  Kalmanson, relying

on judicial estoppel, has filed a motion to exclude evidence of the debtor's alleged domestic abuse

by Rendon. (Doc. No. 745 in Main Case).  In making this argument, Kalmanson points to one of the

many domestic violence incidents that occurred during the debtor's marriage to Rendon—the one

that occurred in Indiana on March 24, 1993.  After the incident, the debtor had returned to live with

Rendon, and, on July 20, 1993, she filed a statement with the Indiana law enforcement authorities

changing her story and stating she no longer wanted to pursue criminal charges. (Kalmanson Ex. No.

68).

Kalmanson now argues that the principle of judicial estoppel prevents the debtor from seeking damages against him for exposing her to danger based on what happened in Indiana and, at the same time, retracting her story that any abuse actually occurred. Judicial estoppel, also known as the doctrine of inconsistent positions, is a legal principle that precludes a party from asserting a position in one legal proceeding inconsistent with a position taken by that same party in the same or prior litigation. The function of judicial estoppel is to "protect the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment." New Hampshire v. Maine, 532 U.S. 742, 749-50 (2001) (internal citations and quotations omitted); American Nat'l Bank of Jacksonville v. Federal Dep. Ins. Corp., 710 F.2d 1528, 1536 (11th Cir.1983) ("Judicial estoppel is applied to the calculated assertion of divergent sworn positions. The doctrine is designed to prevent parties from making a mockery of justice by inconsistent pleadings.") (internal citation omitted); In re Coastal Plains, Inc., 179 F.3d 197, 205 (5th Cir. 1999) (explaining that, "[t]he purpose of the doctrine is to protect the integrity of the judicial process by preventing parties from playing fast and loose with the courts to suit the exigencies of self interest" and that "the doctrine is intended to protect the judicial system, *rather than the litigants. . ."* ) (emphasis in original) (internal citations and quotations omitted).

While there is no "exhaustive formula for determining the applicability of judicial estoppel" New Hampshire, 532 U.S. at 751, and courts are instructed to consider all of the circumstances in a case, Burnes v. Pemco Aeroplex, Inc., 291 F.3d 1282, 1285-86 (11th Cir. 2002), in the Eleventh Circuit, fundamental considerations include whether "the allegedly inconsistent positions were made under oath in a prior proceeding. . . and whether such inconsistencies were "shown to have been calculated to make a mockery of the judicial system." Salomon Smith Barney, Inc. v. Harvey, M.D., 260 F.3d 1302, 1308 (11th Cir.2001). Among other factors appropriate to consider are whether the party succeeded in persuading a tribunal to accept the earlier position, so that judicial acceptance of the inconsistent position in a later proceeding creates the perception that either court was misled, and

whether the party advancing the inconsistent position would derive an unfair advantage on the

opposing party. <u>New Hampshire</u>, 532 U.S. at 750-51 (internal citations omitted).

Judicial estoppel is not applicable here because the Court finds that, although the debtor may

have exaggerated the extent of the domestic violence incident that occurred on that one night in

Indiana in March 1993, Rendon did hold the debtor and their child against the debtor's will.

Moreover, the debtor's testimony, which the Court finds credible, was that she faced escalating

physical and emotional domestic violence during her marriage to Rendon.  Her fear of Rendon was

not based on one single incident.  Lastly, the debtor's retraction of her story as to what happened on

that one night in Indiana likely was not voluntary.  The debtor testified that Rendon, with whom she

was then living, forced her to withdraw the pending criminal charges against him.[37]    The debtor,

although over-estimating any current risk of harm from Rendon, certainly was a victim of domestic

violence during her marriage, irrespective of any later retraction of her charges.

Judicial estoppel simply is not applicable.  Kalmanson has failed to demonstrate any basis to

exclude evidence of the debtor's domestic abuse during her marriage to Rendon.  Kalmanson's

Motion to Exclude Evidence of Alleged Abuse (Doc. No. 745 in Main Case) is denied.

<u>Kalmanson's Post-Trial Motion to Strike Debtor's Answer and Motions for Contempt</u>.

Kalmanson has filed a motion to strike the debtor's answer and for contempt, essentially restating *in*

*toto* all of his claims against the debtor.  (Doc. No. 746 in Main Case).  After including verbatim the

vast majority of Kalmanson's Post-Trial Brief, Kalmanson argues in a three paragraph conclusion

that the Court should disregard all of the debtor's evidence and strike all of her pleadings because

---

[37] This circumstance is recognized as a common feature in domestic violence cases.  <u>See</u> Supreme Court of Texas, *Gender Bias Task Force of Texas Final Report* 74-76 (1994) (examining prosecutorial practice of dismissing criminal charges when victim refuses to testify or withdraws criminal charge against her abuser); <u>id.</u> at 73-75 (1994) (relating common observation of victims, advocates, lawyers, and judges that prosecutorial reluctance to proceed with criminal prosecution of abusers is based on frustration with victims' hesitancy to continue); <u>see also</u> Kelly Rowe, Comment, *The Limits of the Neighborhood Justice Center: Why Domestic Violence Cases Should Not Be Mediated*, 34 Emory L.J. 855, 908 10 (1985) (examining effective responses to domestic violence cases that involve "no drop" policies or support mechanisms to encourage victims to pursue remedy); <u>cf.</u> Utah Code Ann. s 77-36 -3(1)(e) (Supp. 1995) (prohibiting court from dismissing a domestic violence case unless "it has reasonable cause to believe that the dismissal would benefit the victim").

she falsely claimed participation in a federal witness protection program, attempted to intimidate witnesses, falsely claimed continuing harassment by Rendon, presented a forged signature by Rendon terminating his parental rights, and investigated and initiated unsupported actions against counsel for Kalmanson.

The Court has addressed Kalmanson's substantive claims above. The Court does not find sufficient indicia of bad acts or improper action by the debtor to warrant the extreme action suggested by Kalmanson—the striking of the debtor's evidence and the dismissal of her claims. Kalmanson's Motion to Strike Debtor's Answer and Motions for Contempt (Doc. No. 746 in Main Case) is denied.

Kalmanson's Post-Trial Motion to Strike Debtor's Rebuttal Arguments.  In this motion, Kalmanson asks the Court to strike the debtor's post-trial rebuttal arguments because they contain a "vitriolic tirade against Kalmanson," reference facts not admitted into evidence during the trial, and attempt to appeal to the sympathy of the Court. (Doc. No. 779 in Main Case).  The trial in this case was tried by a judge, not a jury.  This particular judge has had 15 years experience focusing only on admitted evidence and weeding out emotional arguments that play to a jurist's sympathy as opposed to reason.  Perhaps the motion was filed merely to accentuate the sections of the debtor's rebuttal argument to which Kalmanson wanted to direct the Court's attention, however, striking the pleadings after reading them serves no purpose.  The Court, to the best of its ability, will apply the law based on the admitted evidence and need not strike an argumentative brief.  Moreover, it is interesting that Kalmanson refers to the debtor's comments as "vitriolic."  Based on observations of these two parties over the last four years, and as amply demonstrated by the volume of this case file and the sheer number of contested matters addressed in this Memorandum Opinion, the Court has concluded that the only way these two parties communicate is in a vitriolic nature, on both sides. Therefore, Kalmanson's Motion to Strike Nofziger's Rebuttal Argument (Doc. No. 779 in Main Case) is denied.

   <u>Debtor's Post-Trial Motions to Stay State Court Proceedings and Roy's Post-Trial Motions to Strike Debtor's Emergency Motions (Doc. No. 773 in Main Case)</u>.  The debtor lastly has filed two motions asking the Court to stay the hearings set in the Nofziger divorce action pending in Lake County, Florida, Case No. 2004-DR-63, and to find Roy in further contempt of Court. (Doc. Nos. 757 and 770 in Main Case).   Specifically, in the pending child visitation dispute between the debtor and Arlynn Nofziger, Roy asked the debtor questions relating to her current name and social security number as well as questions relating to the children.   The debtor contends that these questions violated the terms of the Protective Orders.

   In response, Roy filed a motion to strike the debtor's motion for contempt challenging his actions in the Lake County state court matter.  (Doc. No. 773 in Main Case).  Roy argues he is attempting to enforce prior final orders of the Florida state court granting Arlynn Nofziger visitation rights with his children.  He is entitled to ask questions relating to the children, their schools, and circumstances and argues that the debtor's recent motions really are an attempt to collaterally attack the state court orders, which is prohibited by the <u>Rooker-Feldman</u> doctrine.  <u>Rooker V. Fid. Trust Co</u>., 263 U.S. 413 (1923); <u>District of Columbia Court of Appeals v. Feldman</u>, 460 U.S. 462, 483, n. 16 (1983).

   In light of the Court's reconsideration of the entry of the Protective Orders and the result that all pleadings in this case will be unsealed and all orders directing confidentiality will be vacated, the Court need not spend any further time on this issue.  The Protective Orders and their restrictions no longer will exist and shall not serve as a basis for the debtor refusing to answer any questions in the future.

   Moreover, as stated earlier, this Court intends to allow the Lake County court to fully and completely adjudicate the pending child visitation dispute and to enforce its orders as it sees fit. Bankruptcy courts are courts of limited jurisdiction.  Certainly, child custody and visitation rights are well beyond the purview of the jurisdiction of a bankruptcy court and are better handled by the appropriate family law court.  <u>Elk Grove Unified School Dist. v. Newdow</u>, 542 U.S. 1, 12 (2004)

(holding "the whole subject of the domestic relations of husband and wife, parent and child, belongs to the laws of the States and not to the laws of the United States") (citing In re Burrus, 136 U.S. 586, 593-594 (1890)).  See also Mansell v. Mansell, 490 U.S. 581, 587 (1989) (holding "domestic relations are preeminently matters of state law"); Moore v. Sims, 442 U.S. 415 (1979) (holding "[f]amily relations are a traditional area of state concern").

As such, the debtor's post-trial motions for contempt and to stay the pending Lake County proceedings are denied.  (Doc. Nos. 757 and 770 in Main Case).  Roy's motion to strike the debtor's motions is denied as moot.  (Doc. No. 773 in Main Case).

Conclusion.  All matters pending in this bankruptcy case and its related adversary proceeding are resolved by this Memorandum Opinion.  Separate orders consistent with this ruling shall be entered.  In the end, after expending untold hours of judicial time over the last four years and other than requiring Kalmanson to reimburse the debtor for costs incurred as a result of his misconduct during his deposition, neither party was awarded any damages.  In light of this underwhelming result, perhaps both parties should consider the *objective* viability of their claims before filing any further disputes with this or any other court.

DONE AND ORDERED on June 2, 2008.

KAREN S. JENNEMANN
United States Bankruptcy Judge

Copies provided to:

Debtor:  Linda J. Nofziger, #054, PO Box 2465, Harrisburg, PA  17105-2465

Trustee:  Carla Musselman, 1619 Druid Road, Maitland, FL  32751

Trustee's Attorney:  John H. Meininger, III, P.O. Box 1946, Orlando, FL  32802

United States Trustee, 135 W. Central Blvd., Suite 620, Orlando, FL  32801

Plaintiff: Mitchel Kalmanson, P.O. Box 940008, Maitland, FL  32784

Plaintiff's Attorney:  David McFarlin, Esquire, 1851 West Colonial Drive, Orlando, FL 32804

William Glen Roy, Jr., 411 West Central Parkway, Altamonte Springs, FL  32714-2409

T.W. Ackert, Esquire, P.O. Box 2548, Winter Park, FL  32790